# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PETER IKAI VAN NOPPEN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:14-cv-01416 |
| vs. | ) ) ) | Hon. James F. Holderman<br><br>Hon. Sidney I. Schenkier |
| INNERWORKINGS, INC., ERIC D. BELCHER, and JOSEPH M. BUSKY, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS'
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT ("AC")**

September 29, 2014

Elizabeth A. Coleman (Illinois Bar #6236597)
Howard S. Suskin (Illinois Bar #6185999)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
(312) 222-9350

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................1

THE APPROPRIATE PLEADING STANDARDS ............................................................5

ARGUMENT .......................................................................................................................5

I.      COUNT I SHOULD BE DISMISSED. ...................................................................5

     A.  Plaintiff Lacks Standing To Challenge Statements Made After February 5, 2013. ........6

     B.  Count I Fails To Plead In Accordance With The PSLRA. ............................................7

     C.  Count I Fails To State A Claim Regarding (1) The Inside Sales Division, (2) The Internationalization Of PPM4, (3) The Company's Enterprise Client Retention Rate, And (4) The Company's Class-Period Financials. .........................................................9

          1.  Plaintiff Fails To Plead Material Falsity...................................................................9

              a.  The Inside Sales Division. ...............................................................................9

              b.  The Internationalization Of PPM4....................................................................16

              c.  The Enterprise Client Retention Rate. ..............................................................18

              d.  The Company's Class-Period Financials. .........................................................19

          2.  Plaintiff Fails To Plead Facts Supporting The Strong Inference Of Scienter That The PSLRA Requires.................................................................................................20

              a.  Belcher's Stock Sales Do Not Demonstrate Scienter. .......................................20

              b.  Allegations That Belcher And Busky Received Company Stock And Were Eligible For Performance Bonuses Do Not Establish Scienter...........................22

              c.  The CWs Are Inadequate To Plead Scienter. ....................................................22

     D.  Count I Fails To State A Claim Regarding Productions Graphics. .................................26

          1.  Plaintiff Fails To Plead The Strong Inference Of Scienter That The PSLRA Requires. ..................................................................................................................26

              a.  Delaune's Allegations Do Not Contribute To An Inference Of Scienter. ...........27

              b.  Calzolari's Allegations Do Not Establish Scienter.............................................31

              c.  CW Allegations Do Not Establish Scienter.......................................................32

              d.  Plaintiff's Remaining Allegations Do Not Establish Scienter. ............................32

          2.  Plaintiff Fails To Plead Material Falsity.................................................................33

     E.  Certain Forward-Looking Statements Are Protected By The PSLRA. ...........................33

          1.  The Statements Were Forward-Looking..................................................................34

          2.  The Statements Were Accompanied By Meaningful Cautionary Language. ...........34

i

F.   Several Of The Challenged Statements Were Immaterial Puffery. ...............................36

II.   COUNT II SHOULD BE DISMISSED.................................................................................37

A.   The AC Lacks Any Description Of Defendants' "Deceptive Or Manipulative Acts" That Distinguishes Count II From Count I. ................................................................37

B.   Count II Does Not Adequately Support A Strong Inference Of Scienter.......................38

III.   COUNT III SHOULD BE DISMISSED. .............................................................................39

A.   Plaintiff Fails To Allege An Underlying Violation Of Securities Law. .........................39

B.   Plaintiff Fails To Allege General Or Specific Control. .................................................39

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

CASES

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ..........................................................................21

*Alizadeh v. Tellabs, Inc.*,
    2014 WL 2726676 (N.D. Ill. June 16, 2014)...................................................8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................5, 19, 33

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ..........................................................34, 36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................5, 37

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ........................................................8

*Chu v. Sabratek Corp.*,
    100 F. Supp. 2d 827 (N.D. Ill. 2000) .........................................................22

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
    2010 WL 2169491 (N.D. Ill. May 26, 2010)...................................................6

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ........................................................... passim

*Clark v. TRO Learning Inc.*,
    1998 WL 292382 (N.D. Ill. May 20, 1998)....................................................7

*Conlee v. WMS Indus., Inc.*,
    2012 WL 3042498 (N.D. Ill. July 25, 2012)...................................................8

*Conlee v. WMS Indus., Inc.*,
    2013 WL 1767648 (N.D. Ill. Apr. 24, 2013) .................................................36

*Constr. Workers Pension Fund Lake Cty. & Vicinity v. Navistar Int'l*,
    2014 WL 3610877 (N.D. Ill. Jul. 22, 2014)...................................................8

*Cox v. JED Capital, LLC*,
    2014 WL 3397216 (N.D. Ill. July 11, 2014)...................................................5

*Davis v. Coopers & Lybrand*,
    787 F. Supp. 787 (N.D. Ill. 1992) ..............................................................40

*Davis v. SPSS, Inc.*,
    385 F. Supp. 2d 697 (N.D. Ill. 2005) ...........................................................6, 19, 22

*Desai v. Gen. Growth Props., Inc.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ...............................................................33, 38

*Donohoe v. Consol. Operating & Prod. Corp.*,
    30 F.3d 907 (7th Cir. 1994) ...............................................................................39, 40

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
    594 F.3d 783 (11th Cir. 2010) .................................................................................34

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ...................................................................................21

*Elec. Workers Pension Trust Fund of IBEW Local Union v. CommScope*,
    2013 WL 4014978 (W.D.N.C. Aug. 6, 2013)..........................................................34

*Garden City Emps.' Ret. Sys. v. Anixter Int'l*,
    2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)......................................................8, 21

*Garden City Emps.' Ret. Sys. v. Anixter Int'l*,
    2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)..........................................................21

*Gavish v. Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004).......................................................20

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................................21

*Guar. Residential Lending, Inc. v. Int'l Mortg. Ctr., Inc.*,
    305 F. Supp. 2d 846 (N.D. Ill. 2004) ...............................................................1, 2, 3

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .....................................................................................1

*Higginbotham v. Baxter Int'l*,
    495 F.3d 753 (7th Cir. 2007) ........................................................................... passim

*Hutchison v. Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)....................................................................................19

*In re Azurix Corp. Sec. Litig.*,
    198 F. Supp. 2d 862 (S.D. Tex. 2002) ....................................................................37

*In re Bally Total Fitness Sec. Litig.*,
    2006 WL 3714708 (N.D. Ill. July 12, 2006)...........................................................24

*In re Barclays Bank PLC Sec. Litig.*,
   2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) ..............................................................19

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)..............................................................................28

*In re Career Educ. Corp. Sec. Litig.*,
   2006 WL 999988, (N.D. Ill. Mar. 28, 2006)..........................................................6

*In re Career Educ. Corp. Sec. Litig.*,
   2007 WL 1029092 (N.D. Ill. Mar. 29, 2007)....................................................1, 20

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ............................................................................34

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)..............................................................21, 22

*In re Guidant Corp. Sec. Litig.*,
   536 F. Supp. 2d 913 (S.D. Ind. 2008) ................................................................19

*In re Hansen Natural Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..............................................................20

*In re Harley-Davidson, Inc. Sec. Litig.*,
   660 F. Supp. 2d 969 (E.D. Wis. 2009)...............................................................7, 24

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) ...........................................................33, 36

*In re Redback Networks, Inc. Sec. Litig.*,
   2006 WL 1805579 (N.D. Cal. Mar. 20, 2006).....................................................38

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
   915 F. Supp. 2d 450 (S.D.N.Y. 2013)..................................................................31

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
   669 F.3d 68 (1st Cir. 2012).............................................................................14, 15

*In re Zumiez Inc. Sec. Litig.*,
   2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ..................................................11

*Janbay v. Canadian Solar, Inc.*,
   2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ..........................................23, 25, 32

*Johnson v. Tellabs, Inc.*,
   262 F. Supp. 2d 937 (N.D. Ill. 2003) ......................................................33, 36, 39

*Karam v. Corinthian Colleges, Inc.*,
    2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ..................................................................25

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991) ........................................................................................28

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) .......................................................................................22

*Last Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*,
    455 F. Supp. 2d 788 (N.D. Ill. 2006) .....................................................................37, 38

*Lauria v. Biosante Pharm., Inc.*,
    968 F. Supp. 2d 951 (N.D. Ill. 2013) ............................................................................8

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ........................................................................................38

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
    2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ...........................................................23

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    2011 WL 338865 (S.D. Ind. Jan. 28, 2011) ...............................................................23

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) .......................................................................................22

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .......................................................................................20

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) .......................................................................................38

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ............................................................................. passim

*City of Roseville Emps.' Ret. v. Sterling*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................25

*Robin v. Arthur Young & Co.*,
    915 F.2d 1120 (7th Cir. 1990) .....................................................................................24

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .......................................................................................21

*Roots P'ship v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) .......................................................................................6

*S.E.C. v. Benger*,
   931 F. Supp. 2d 908 (N.D. Ill. 2013) ................................................................38

*S.E.C. v. Cohmad Sec. Corp.*,
   2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) .......................................................31

*Schlifke v. Seafirst Corp.*,
   866 F.2d 935 (7th Cir. 1989) ...........................................................................39

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
   365 F.3d 353 (5th Cir. 2004) ...........................................................................21

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.*,
   2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ..........................................17, 34, 39

*Starr v. !Hey, Inc.*,
   2003 WL 21212596 (N.D. Ill. May 23, 2003) ...................................................40

*Stavros v. Exelon Corp.*,
   266 F. Supp. 2d 833 (N.D. Ill. 2003) .........................................................1, 33, 36

*Tabor v. Bodisen Biotech, Inc.*,
   579 F. Supp. 2d 438 (S.D.N.Y. 2008) ................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .........................................................................7, 20, 26

*Wade v. Wellpoint, Inc.*,
   892 F. Supp. 2d 994 (S.D. Ind. 2010) ...................................................21, 23, 32

*Waldock v. M.J. Select Global, Ltd.*,
   2005 WL 3542527 (N.D. Ill. Dec. 27, 2005) ....................................................40

*Woltring v. Specialized Loan Servicing, LLC*,
   2014 WL 2708581 (E.D. Wis. June 16, 2014) ...................................................28

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) .........................................................................38

*Zerger v. Midway Games, Inc.*,
   2009 WL 3380653 (N.D. Ill. Oct. 19, 2009) ......................................................6

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...........................................................................11

## STATUTES

15 U.S.C. § 78u-4(a) ...........................................................................................6

15 U.S.C. § 78u-4(b)(1) ............................................................................................7

15 U.S.C. § 78u-4(b)(2) ....................................................................................20, 26

15 U.S.C. § 78u-5(i)(1) ..........................................................................................34

15 U.S.C. § 78u-5(c) ...............................................................................................33

**OTHER AUTHORITIES**

H.R. Rep. No. 104-369 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730 ...................34

*Post-Closing Earnouts in M&A Transactions: Avoiding Common Disputes*, at 1, *available at* http://tinyurl.com/nr587f5........................................................................4

## INTRODUCTION

The Amended Class Action Complaint ("AC") rises or falls on its Count I—which Count II merely duplicates and which serves as the predicate for Count III—and Count I fails on multiple, independent, and overlapping grounds. At the threshold, Plaintiff lacks standing to challenge many of the statements that form the basis of its claims, and the AC engages in forbidden "puzzle" and "group" pleading throughout. Moreover, to the extent that Defendants can discern Plaintiff's claims notwithstanding the AC's significant pleading defects, Plaintiff does not adequately allege material falsity or scienter as to any of its claims. Finally, if more were needed, most of the statements that Plaintiff challenges are protected by the statutory safe harbor for forward-looking statements, are immaterial puffery, or both. On any of these alternative grounds, the AC should be dismissed with prejudice.

## BACKGROUND

This section is based on the allegations of the AC, the documents referenced therein, and other judicially noticeable documents. The Court may take judicial notice of InnerWorkings' SEC filings (including its press releases, which were filed with the SEC) without converting this motion to dismiss into a motion for summary judgment under FRCP 56. *See In re Career Educ. Corp. Sec. Litig.*, 2007 WL 1029092, at *1 n.5 (N.D. Ill. Mar. 29, 2007); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 n.8 (N.D. Ill. 2003). This Court also may consider material referenced in the AC and central to Plaintiff's claims, including but not limited to InnerWorkings' SEC filings, transcripts of the Company's earnings calls, and transcripts from Company employee speaking appearances at investor conferences. *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009). And "actual document[s] will override inconsistent descriptions of the document[s] alleged in the body of the complaint." *Guar. Residential Lending, Inc. v. Int'l Mortg. Ctr., Inc.*, 305 F. Supp. 2d 846, 852 (N.D. Ill. 2004).

1

**InnerWorkings' Business.**  InnerWorkings is a global company headquartered in Chicago that provides print management and promotional solutions to corporate clients.  AC ¶¶2, 30.  The Company procures printed products from suppliers and sells those products to clients. *Id.* ¶3.  "Enterprise" clients—with whom InnerWorkings contracts to provide some or substantially all of their printed products on a recurring basis—accounted for approximately 70-75% of Company revenue during the putative class period.  *Id.*  "Middle market" clients, also known as the "small to medium-sized business market" (the "SMB"), accounted for 25-30% of revenue during that period.  *Id.*  As of December 31, 2012, InnerWorkings achieved annual revenue of approximately $800 million and operated globally.  *Id.* ¶¶30, 40.

During the putative class period, InnerWorkings used a proprietary software system known as PPM4, which stored, analyzed, and tracked the production capabilities of the Company's supplier network in the United States.  *Id.* ¶43.  PPM4 enabled the Company to gather job specifications, identify suppliers, establish pricing, manage print production, and coordinate purchase and delivery of the finished product.  *Id.*

**Inside Sales.**  During the second half of 2010, InnerWorkings began testing and investing in a new telesales project, dubbed the "inside sales" initiative.  *Id.* ¶61.  The purpose of the initiative was to generate new SMB clients through an in-house cold-call center.  *Id.* ¶6.  After an initial testing period of 18 months, the Company was encouraged by the initiative's preliminary results.  *Id.* ¶61.  In February 2012, the Company announced plans to expand the inside sales division, expecting that the division's workforce would triple, from 60 sales representatives to 200, by the end of 2012.  *Id.*  Although the initiative was not profitable at the time, the Company indicated that it expected it would become profitable sometime in 2013.  *Id.*

Over the remainder of 2012 and during the first half of 2013, InnerWorkings reiterated its

expectation that the Company's continued investment in the inside sales division would prove successful. *See, e.g.*, ¶¶183, 187, 194, 202, 206, 216. For example, in November 2012, InnerWorkings' CEO Eric Belcher expressed his belief that the division represented a "huge opportunity for the Company" and that the Company was "laying the groundwork" for future success. *Id.* ¶194. Likewise, in May 2013, InnerWorkings noted that although inside sales represented "still a relatively small portion of the overall revenue of the Company, and still an overall small portion of the middle-market business for us," the Company believed that the division would become the future "driver for us in this segment of the business." *Id.* ¶216.

In August 2013, InnerWorkings announced that the division's performance during Q2 2013 had not met Company expectations and that the Company was rethinking its "bigger picture strategic ideas" for the group. Ex Y, 8/8/13 TR at 4, 7. InnerWorkings stated publicly that it had made changes to the division's management and was looking to align with a partner to help bolster the Company's SMB client-acquisition capability going forward. *Id.* at 4. Belcher acknowledged that "[w]e've had some learnings along the way, which I guess in hindsight would be anticipated, always the case when you try something new and bold like this." *Id.* at 7.

**Productions Graphics.** On October 24, 2011, InnerWorkings acquired all of the securities of Productions Graphics through a stock purchase agreement. AC ¶¶102, 104; Ex. B, 10/25/11 8-K, at Ex. 10.1 (the "SPA"), at 2. Productions Graphics was a print management firm based in Paris, France with operations in 12 countries and 2011 sales of $30 million. AC ¶102. At the time of its acquisition, Productions Graphics was fully held by Christophe Delaune, CEO of Productions Graphics, and Winthrop Limited, an organization affiliated with Delaune. Ex. B, SPA at 1; Ex. BB, 2/18/14 8-K at 2. Delaune signed a long term contract with InnerWorkings, agreeing to serve as President of Productions Graphics going forward. AC ¶¶8, 116.

Pursuant to the SPA, InnerWorkings' acquisition of Productions Graphics was valued at €67,911,000. AC ¶8; Ex. B, SPA at 2. Only a small portion of the deal's value—8%, or €4,191,000—was paid upfront to Delaune and Winthrop Limited. *Id.* InnerWorkings was to pay the remainder in the form of "earn-outs" only if Productions Graphics met certain financial milestones over a four-year period.[1] *Id.* In 2011 and 2012, Productions Graphics initially appeared to exceed those targets. Consequently, Delaune and Winthrop Limited obtained their payments for those first two periods: €1.2 million and €5.9 million for 2011 and 2012, respectively, for a total of €7.1 million. AC ¶¶9, 16; Ex. B, SPA at 2; Ex. AA, 11/6/13 8-K at 3.

In October 2013, InnerWorkings removed Delaune as President of Productions Graphics. AC ¶21. Thereafter, InnerWorkings informed the market that the Company had investigated Delaune's conduct relating to certain transactions affecting earn-out payments under the SPA. Ex. BB, 2/18/14 8-K at 2. InnerWorkings revealed that based on the results of the review, "the Company concluded it was the victim of a fraud perpetrated by [Delaune]" and that "[Delaune] artificially inflated results to meet earn-out targets and induce the Company to make earn-out payments relating to the Productions Graphics acquisition." *Id.* To reverse the revenue recognized in connection with Delaune's suspect transactions in 2011 and 2012, the Company issued restated financials on March 18, 2014. Ex. CC, 3/18/14 10-K at 3. InnerWorkings has filed a criminal complaint in France "seeking to redress the harm caused by [Delaune's] conduct." *Id.* at 53.

**Plaintiff's Claims Against Defendants.** Count I alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b). *Id.* ¶¶258-68. Plaintiff contends that these misrepresentations were made in a series of SEC filings, earnings calls, and investor

---

[1] This is a common structure for M&A transactions. *See, e.g.*, *Post-Closing Earnouts in M&A Transactions: Avoiding Common Disputes*, at 1, *available at* http://tinyurl.com/nr587f5.

conferences from February 2012 through August 2013. *Id.* ¶¶179-227. Count II alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). *Id.* ¶¶269-77. Count III alleges "control person" violations against Belcher and Busky under Section 20(a) of the Exchange Act. *Id.* ¶¶278-81.

## THE APPROPRIATE PLEADING STANDARDS

A complaint's allegations "'must be enough to raise a right to relief above the speculative level.'" *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (FRCP 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). To survive a motion to dismiss, a plaintiff must plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable." *Ashcroft*, 556 U.S. at 678.

Because the AC alleges fraud in all of its counts, *see* AC ¶¶258-81, its allegations are subject to the heightened pleading demands of FRCP 9(b), which requires a plaintiff to plead fraud with "particularity." For each allegation, Plaintiff must identify the "who, what, when, where, and how" of the fraud. *Cox v. JED Capital, LLC*, 2014 WL 3397216, at *3 (N.D. Ill. July 11, 2014) (Holderman, J.). And, as set forth below, the pleading requirements with regard to Plaintiff's Section 10(b) counts are more stringent, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), than even FRCP 9(b) demands. *Id.*

## ARGUMENT

## I. COUNT I SHOULD BE DISMISSED.

Count I fails on multiple, independent grounds. Plaintiff lacks standing to challenge statements made after February 5, 2013. (§A, below.) The claims do not meet the PSLRA's

pleading standards. (§B.) Plaintiff fails to plead that many of the challenged statements were materially false when made. (§C.1, D.2.) Plaintiff fails to adequately plead scienter. (§§C.2, D.1.) Defendants' forward-looking statements are protected by the PSLRA's safe harbor. (§E.) And many of the challenged statements were at most non-actionable puffery. (§F.)

### A. Plaintiff Lacks Standing To Challenge Statements Made After February 5, 2013.

Plaintiff alleges that Defendants made over sixty false and misleading statements on nineteen occasions during the class period. *See* AC ¶¶179-230. Plaintiff, however, lacks standing to assert claims with respect to statements made after February 5, 2013, when Plaintiff last purchased InnerWorkings stock. *See* Dkt. No. 15-2, Plymouth Cnty's Sworn Cert., at Ex. A. "[P]ost-purchase statements cannot form the basis of Rule 10b-5 liability," because they "could not have affected the price at which plaintiff actually purchased." *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992).

Courts in the Northern District have applied this "well settled and unambiguous" rule to hold that a lead plaintiff in a putative securities class action cannot state a claim based on statements made after that plaintiff's last stock purchase. *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *4-5 (N.D. Ill. Oct. 19, 2009) (granting motion to dismiss); *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 2010 WL 2169491, at *4 (N.D. Ill. May 26, 2010), *aff'd*, 711 F.3d 754 (7th Cir. 2013) (same); *In re Career Educ. Corp. Sec. Litig.,* 2006 WL 999988, at *2-3 (N.D. Ill. Mar. 28, 2006) (same); *Davis v. SPSS, Inc.,* 385 F. Supp. 2d 697, 705-06 (N.D. Ill. 2005) (same).

Plaintiff – perhaps trying to address this defect – claims that State-Boston Retirement System is an "additional plaintiff" in this action. AC ¶ 29. But State-Boston is not a party to this case, much less a named lead plaintiff, and any hypothetical standing State-Boston might have to raise certain claims is irrelevant. *See* PSLRA, 15 U.S.C. §78u-4(a)(3) (establishing rigorous

procedures for appointment of lead plaintiff in securities class actions).  Accordingly, this Court should not consider any statements made after February 5, 2013 when adjudicating this motion.

### B.  Count I Fails To Plead In Accordance With The PSLRA.

Plaintiff must satisfy the PSLRA's "uniform pleading standard for §10(b) actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007).  The PSLRA is a "check against abusive litigation by private parties," and "[e]xacting pleading requirements are among the control measures Congress included" to serve this end.   *Id*. at 313.  A plaintiff must "specify *each statement* alleged to have been misleading, [and] the *reason or reasons why* the statement is misleading."  15 U.S.C. §78u-4(b)(1) (emphasis added).  "[T]he court shall, on the motion of any defendant, dismiss the complaint" if this pleading requirement is not met.  *Id*. §78u-4(b)(3)(A).

Plaintiff fails to meet that requirement, and Count I should be dismissed on this ground alone.  "Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made."  *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009).  In a 110-page, 281-paragraph complaint, Plaintiff fails to allege specific misstatements by InnerWorkings, much less precise reasons why any statement was misleading.  Instead, Plaintiff carpets its complaint with long block quotations sprinkled with seemingly random italicization.  *See, e.g.*, AC ¶¶183, 187, 194, 197, 219.  The PSLRA does not permit this form of pleading.  *See, e.g.*, *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiff['s] use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements."); *see also Clark v. TRO Learning Inc.*, 1998 WL 292382, at *4 (N.D. Ill. May 20, 1998) ("recitation of quotations without any explanation as to which allegations were false or material" failed to satisfy PSLRA specificity requirements).

For example, paragraph 197 of the AC contains *seven* separate long excerpts of statements allegedly made by Defendants.  Defendants and the Court are left to guess which of these are purportedly misleading and why.  And although Plaintiff has italicized text in places, the AC does not indicate what significance the italicization has or how the text was misleading.  *See Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008) (block quotes with "apparently random sentences bolded and italicized" is not sufficient to satisfy PSLRA).

  Elsewhere, Plaintiff italicizes statements by third-parties.  *See, e.g.*, AC ¶187.  In other places, Plaintiff contends that *non*-italicized statements were false.  *Id.* ¶¶216-17.  Courts routinely dismiss putative securities class actions that rely on such "puzzle-pleading" complaints.  *See, e.g.*, *Constr. Workers Pension Fund Lake Cty. & Vicinity v. Navistar Int'l*, 2014 WL 3610877, at *1 (N.D. Ill. Jul. 22, 2014); *Alizadeh v. Tellabs, Inc*., 2014 WL 2726676, at *4-6 (N.D. Ill. June 16, 2014); *Lauria v. Biosante Pharm., Inc*., 968 F. Supp. 2d 951, 957 (N.D. Ill. 2013); *Conlee v. WMS Indus., Inc.,* 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012).

And Plaintiff also engages in "group pleading"—attributing statements to all defendants collectively.  *See, e.g.*, AC ¶179.  This, too, is inconsistent with the PSLRA, *Pugh*, 521 F.3d at 693-94, and warrants dismissal of Count I.

* * *

In the remainder of this memorandum, Defendants attempt to address the principal statements that Plaintiff appears to challenge.  But Plaintiff's defective pleading style makes it impractical for this brief to address in detail every sentence quoted in the pleading.  InnerWorkings therefore attaches as Exhibit A a table containing every statement quoted in the AC and a brief explanation why each is not actionable.  *See Garden City Emps.' Ret. Sys. v. Anixter Int'l*, 2011 WL 1303387, at *9 (N.D. Ill. Mar. 31, 2011) ("*Garden City I*").

8

**C.  Count I Fails To State A Claim Regarding (1) The Inside Sales Division, (2) The Internationalization Of PPM4, (3) The Company's Enterprise Client Retention Rate, And (4) The Company's Class-Period Financials.**

Plaintiff's allegations with regard to the above four categories of challenged statements fail for two reasons: (1) Plaintiff has not adequately alleged that any of the challenged statements was materially false or misleading, and (2) Plaintiff has not adequately pled the strong inference of scienter that the PSLRA requires.

### 1.  Plaintiff Fails To Plead Material Falsity.

The AC fails to plead with the particularity required by the PSLRA and Rule 9(b) that any of the challenged statements were materially false when made. *See* AC ¶¶183-84, 187-88, 191-92, 194-95, 197-98, 202-03, 206-08, 216, 218-20, 225-26.

### a.  The Inside Sales Division.

Plaintiff contends that Defendants made misleading statements about InnerWorkings' inside sales initiative. AC ¶¶183, 187, 191, 194, 197, 202, 206, 216, 219, 225. But Plaintiff fails to properly allege that any of the challenged statements were false or misleading.

**Courts Steeply Discount Allegations Based On Confidential Witnesses.** Regarding the Company's inside sales division, Plaintiff relies *exclusively* on allegations from eight confidential witnesses ("CWs"). *See* AC ¶¶184, 188, 192, 195, 198, 203, 208, 218, 220, 226 (referring to AC ¶¶72-93, detailing allegations from CW1-CW8). But such allegations carry little weight. "Allegations concerning . . . unnamed confidential sources of damaging information require a heavy discount." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013); *see id.* at 762 (remanding for consideration of possible sanctions against plaintiffs' attorneys for failing to properly investigate CWs). This is because "[t]he sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to

9

the defendants and maybe forcing settlement or inducing more favorable settlement terms." *Id.*
at 759; *see also Higginbotham v. Baxter Int'l,* 495 F.3d 753, 757 (7th Cir. 2007) ("allegations
from 'confidential witnesses' must be 'discounted'" and "[u]sually that discount will be steep").
Because Plaintiff does not name any of the CWs referenced in the AC, *see* Appendix to AC, Dkt.
No. 38-1, this Court must apply a "heavy discount" to their allegations.

**Plaintiff's CWs Do Not Establish That Any Of Defendants' Statements On The**
**Inside Sales Initiative Were False When Made.** In fact, none of the CWs is alleged even to
have an opinion on the accuracy of any of the challenged statements.

**CW1**, a business consultant who was laid off in August 2013, states that "he often saw
internal reports that projected targets greater than what the team was able to deliver, with inside
sales being 'nowhere near there.'" AC ¶72. The reports that CW1 saw, however, came from two
VPs who started work in July 2013, *after* nine of the ten statements Plaintiff challenges regarding
the inside sales initiative were made. *Id.* Likewise, CW1 states that he "received emails . . .
saying that inside sales was supposed to be at $x and that they were only at $x-n" but notes that
he received those emails "during the last couple of months of his tenure," *July and August 2013.*
*Id.* CW1 thus does not supply any specific information on the performance of the inside sales
initiative before all but one of the challenged statements were made.

CW1 also alleges that InnerWorkings would sometimes invite clients and investors to
tour the Company's headquarters, while inside sales personnel would make sure to appear busy.
*Id.* ¶73. But even if true, this does not show that any of the statements to open-market investors
that Plaintiff challenges were false or misleading when made.

**CW2**, a sales manager for mid-level accounts whom the Company laid off in August
2013, alleges that "inside sales in 'no way' met the Company's goals for 2012." AC ¶74. But

CW2 does not show that he was in a position to know the information alleged—he does not

claim to have been part of the inside sales division and is unable to provide any insight into the

Company's "goals" for inside sales in 2012. *See Zucco Partners, LLC v. Digimarc Corp.*, 552

F.3d 981, 996 (9th Cir. 2009) (rejecting CW allegations where plaintiff "fail[ed] to allege with

particularity facts supporting its assumptions that the confidential witnesses were in a position to

be personally knowledgeable of the information alleged").

     CW2 also summarily states that "no more than 15%" of middle market account

executives met their internal targets, AC ¶76 (emphasis omitted), but this (1) does not specify a

time period or (2) relate specifically to the inside sales division within InnerWorkings' middle

market business. In fact, the only specific piece of information to which CW2 refers is an

*August 2013* report allegedly showing that the division was behind in reaching its sales targets

for the third quarter of 2013. *Id.* ¶77. As with the reports and emails cited by CW1, however,

such information says nothing about the challenged statements made before August 2013.

     **CW3** and **CW4**, a financial account manager and a brand delivery associate, make no

substantive allegations on the performance of the inside sales initiative. *Id.* ¶¶80-81.

     **CW5**, a sales manager at InnerWorkings from sometime in 2012 through January 2014,

alleges that he oversaw a team of 10-20 inside sales personnel. He claims he had "direct line

access" to Belcher and "would speak with Belcher about 'growing pains'" in his group. *Id.* ¶82.

CW5 provides no detail as to what "growing pains" his team experienced, whether they were

endemic to the entire inside sales division, or whether they were atypical of any company

launching a new sales initiative. *See In re Zumiez Inc. Sec. Litig.*, 2009 WL 901934, at *9 (W.D.

Wash. Mar. 30, 2009) (holding that anecdotal statements from CWs regarding performance of

their own stores "hardly raise an inference that the alleged problems were widespread throughout

11

the Company"). Nor does CW5 allege that his group's "growing pains" rendered any of the challenged statements false or misleading when made.

CW5 further states that "[InnerWorkings] made a huge mistake by hiring many fresh out of college 'kids'" and that "the failure of the . . . group was clear by . . . July 2013," but these after-the-fact observations do not establish that any of the pre-July 2013 statements challenged in the AC were false or misleading when made. AC ¶83. "[T]here is no fraud by hindsight." *Higginbotham*, 495 F.3d at 759-60.

**CW6** was a business development specialist between May 2012 and January 2014. CW6 alleges that in July 2013, InnerWorkings fired VP of Sales Brian Simms because (1) SMB was consistently below its sales goals, (2) SMB missed its goals by "millions" every quarter, and (3) only 5% of SMB sales representatives made their monthly quotas. AC ¶85. But these claims provide no specific information on the *inside sales division* of SMB, which was a small part of SMB (*see id.* ¶79, alleging that inside sales division made up roughly *10%* of InnerWorkings' middle market revenues as of February 2013). CW6's allegations also lack specificity and fail to indicate the duration of Simms' alleged performance failure within the SMB department.

Additionally, CW6 offers anecdotes suggesting that inside sales personnel were asked to be present on days when investors toured Company headquarters. AC ¶86. As with CW1, however, Plaintiff does not explain how these allegations could establish that any of the challenged statements in the AC (all publicly-made) were false or misleading when made.

**CW7** was a sales executive and lead generation manager who left the Company in December 2012, midway through the putative class period. *Id.* ¶87. CW7 does not provide any specific information regarding the inside sales division. Rather, as with CW6, CW7 makes generalized comments about SMB's alleged failure to meet revenue goals and the overall modest

level of sales income the department generated. *Id.* ¶91 (*e.g.*, "SMB did not make a lot of money"). These irrelevant and temporally limited allegations do not show that any challenged statement was false or misleading when made.

**CW8** was a senior sales manager from January 2013 through August 2013 and lacks personal experience as to what occurred at InnerWorkings between February and December 2012. CW8 allegedly resigned immediately before mass lay-offs in the SMB division in August 2013 because he saw that "the writing was on the wall." *Id.* ¶92. CW8 states that "it was apparent by at least *June 2013* that the Company had stopped investing in SMB." *Id.* (emphasis added). These comments provide no specific information (1) to contradict any challenged statements made before June 2013, or (2) about the inside sales division.

**Plaintiff's Conclusory Allegations Do Not Establish That Any Of Defendants' Statements On The Inside Sales Initiative Were False.** Plaintiff apparently challenges over 40 statements, made on nine separate occasions, related to the Company's inside sales initiative. AC ¶¶183, 187, 191, 194, 197, 202, 206, 216, 219, 225. In the face of Plaintiff's "kitchen-sink" complaint, however, it is infeasible for Defendants to discuss each statement. Instead, Defendants explain why each falsity allegation as to the challenged statements is insufficient.

*First*, Plaintiff alleges that all of the challenged statements on the inside sales initiative were false and misleading because the Company was hiring "inexperienced," "low-productivity" sales personnel "right out of college." *See* AC ¶¶184, 188, 192, 195, 198, 203, 208, 218, 220, and 226. But these allegations do not render any of the challenged statements false. Although Plaintiff challenges statements such as "[t]he Recruiting Team is finding outstanding candidates," AC ¶183, Plaintiff never explains why recent college graduates could not be considered "outstanding candidates" for cold-calling sales work. In retrospect, CW5 says that it

13

was "a huge mistake" to hire "fresh out of college 'kids'" to build the inside sales department, AC ¶83, but the AC offers nothing to show that Defendants *knew* that strategy would not prove successful during the course of the class period.

*Second*, Plaintiff alleges that all challenged statements regarding the inside sales division were false and misleading because Defendants knew that "only a fraction of the inside sales division were meeting their quotas." *Id.* ¶¶184, 188; *see also id.* ¶¶192, 195, 198, 203, 208, 218, 220, 226. But the *only* CW to offer any pre-July 2013 information about the inside sales division's ability to meet internal targets was CW2, who alleged generally that "inside sales in 'no way' met the Company's goals for 2012." *Id.* ¶74. As discussed above, Plaintiff does not plead sufficient detail to show that CW2 was a part of the inside sales initiative, much less that he was in a position to know the information alleged. Moreover, even if certain inside sales personnel did not meet the Company's internal quotas for 2012, that does not render any of Defendants' public statements false or misleading. Because "internal targets may be designed as incentives as much as predictions," *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68, 75 (1st Cir. 2012), allegedly unmet sales quotas indicate little, if anything, about how the inside sales division performed during the duration of the putative class period.

*Third*, Plaintiff alleges that all the challenged statements from February 22, 2013, March 11, 2013, May 7, 2013, May 10, 2013, and August 8, 2013 were false and misleading because "Defendants knew . . . that SMB as a whole was significantly missing targets." *Id.* ¶¶203, 208, 218, 220, and 226. But as explained above, allegations about the SMB as a whole provide no specific information about its *inside sales division*, which, according to Plaintiff, made up only about *10%* of InnerWorkings' middle market revenue as of February 2013. *Id.* ¶79.

*Fourth*, Plaintiff alleges that the challenged statements from November 8, 2012, February

14

13, 2013, and August 8, 2013 were false and misleading because Defendants knew "that there was high turnover in inside sales," including at the VP level. *Id.* ¶¶195, 198, 226. But the only two specific pieces of information relayed by the CWs to corroborate this point were that (1) VP of Sales Simms was terminated in July 2013, *see id.* ¶¶72, 75, 81, 83, 85, 92, and (2) many inside sales personnel were laid off in August 2013, *see id.* ¶¶72, 75, 86, 92. Plaintiff fails to explain how (1) these lay-offs reflect a "high turnover" rate *throughout the class period*, and (2) employee turnover alone rendered any of the challenged statements false or misleading.

*Fifth*, Plaintiff contends that the challenged statements from August 10, 2012 were false and misleading because "inside sales personnel were told to feign 'burning up the phone lines' during investor tours." *Id.* ¶188. But again, Plaintiff fails to explain how this allegation rendered any statement made during the August 10, 2012 conference call false or misleading.

*Sixth*, Plaintiff alleges statements on February 13, 2013 were false and misleading because "the Company was pulling back on its investment in the [inside sales] division." *Id.* ¶198. But none of the CWs suggests there was such a pullback as of February 13, 2013 (much less quantify the extent of the alleged pullback), and Plaintiff marshals no other specific support for this point.

*Seventh*, Plaintiff alleges that a statement on August 8, 2013 was misleading because "Defendants . . . failed to disclose that they were planning a massive layoff of 40 people the same month that they were professing confidence and commitment in the inside sales initiative, and that they had fired Simms in July 2013 because of SMB's underperformance." *Id.* at ¶226. But Defendants made clear during the August 8 conference call that the Company was disappointed with results obtained by the inside sales division and that the Company was in the process of changing its strategy for the group:

15

- **Inside sales did not meet the Company's expectations for Q2 2013**. *See* Ex. Y, 8/8/13 TR at 1 ("while the inside sales area has grown, our expectations were higher"); *id.* at 4 ("[inside sales] fell below our expectations").

- **The Company had changed the leadership of the inside sales group**. *See id.* at 4 ("[w]e've recently reorganized the management of the group"); (referencing "internal changes we've made" with the group).

- **The Company was actively looking to align with a channel partner**. *See id.* at 4 ("we're in discussions with a strategic channel partner that would significantly enhance our client acquisition capability").

- **The Company was shifting its 'big picture' strategy regarding the group**. *See id.* at 7 ("[w]e've got some bigger picture strategic ideas for the group . . . *that will be coming online here later in the year*") (emphasis added).

From these disclosures, the public knew that as of August 8, 2013, the Company was not satisfied with the performance of the inside sales group, had made managerial changes in response, and was looking to make bigger, structural changes in the group in the near future. The Company had no duty to disclose the names of the managers that had been fired, or that the Company might layoff some additional personnel in the future. "There is a difference . . . between a duty of truthfulness and a duty of candor, or between a lie and reticence." *Boeing*, 711 F.3d at 758-59. "There is . . . no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time.'" *Id.* at 759.

Accordingly, Plaintiff has not adequately alleged that Defendants made any false or misleading statements regarding its inside sales division during the putative class period.

      **b.**     **The Internationalization Of PPM4.**

Plaintiff also challenges two statements involving the Company's use of technology, *see* AC ¶¶191, 206, but fails to adequately allege that either was false or misleading when made.

Plaintiff appears to challenge a statement that InnerWorkings' CFO Busky made during a September 2012 conference regarding how InnerWorkings usually communicates with printers:

"[Audience Member:] Your interaction with the printers really is primarily Web-based (inaudible) an appropriate relationship?

[Busky:] Yes, it is Web-based. *The bids go out electronically, come back electronically*, so it is all through data and technology." AC ¶191.

As an initial matter, Plaintiff mischaracterizes Busky's statement, alleging that he said that "the Company's bid process was *fully electronic*." AC ¶192 (emphasis added). In fact, he said "yes" in response to a question whether the Company's interactions with printers were "*primarily* Web-based," *id.* ¶191(emphasis added), not *exclusively* Web-based or electronic.

Plaintiff claims Busky "failed to disclose that large global subsidiaries, such as Productions Graphics, could not use PPM4 at all, and instead relied on manual entry of financial data." *Id.* ¶192. But Busky said that InnerWorkings exchanged bids with suppliers "electronically," not that all of the Company's international subsidiaries were fully integrated to the PPM4 platform. Indeed, just months earlier—as Plaintiff acknowledges—the Company informed the market that PPM4 had not yet been implemented across the Company's global subsidiaries, and that it would not be implemented before the end of 2012. *See* AC ¶95; Ex. C, 2/14/12 TR, at 3, 6-7. Busky's statements could not be misleading for failing to disclose information already known by the public. *St. Lucie Cnty. Fire Dist. Firefighters' Pension Trust Fund v. Motorola, Inc.*, 2011 WL 814932, at *6 (N.D. Ill. Feb. 28, 2011).

Plaintiff also challenges a statement made at a March 11, 2013 conference:

"[Belcher:] Today we are rolling out our technology on a global basis, all currencies, all languages on one platform. *We have already converted Latin America last quarter, Europe this quarter*."

AC ¶206. Plaintiff claims that this was false and misleading because Productions Graphics "was never integrated into an internal system at [InnerWorkings] during the Class Period." *Id.* ¶207. But Belcher was clear that InnerWorkings was still "rolling out" its technology across the globe,

and specifically that the roll out would continue in Europe during the remainder of "this quarter." An exchange between Belcher and an analyst during a conference call less than two months later confirmed that InnerWorkings disclosed—and the market understood—that the Company's rollout of its new technology platform had yet to be accomplished: "[Analyst]: [T]he rollout of the new technology system that you are implementing globally, is that now complete? Mr. Belcher: *It is not complete*. We've rolled it out in some areas of the world." Ex. X, 5/10/13 TR, at 9 (emphasis added). Thus, Plaintiff fails to allege that Defendants made any materially false or misleading statements about the Company's technology platform.[2]

### c.    The Enterprise Client Retention Rate.

Plaintiff also alleges that certain statements Defendants made regarding InnerWorkings' enterprise client retention rate were misleading because the Company failed to disclose that it had lost Google as a client. Specifically, Plaintiff challenges two comments from the Company's February 22, 2013 Investor Day: (1) COO John Eisel's statement that the Company had a "98% client retention rate" with its enterprise customers, and (2) Belcher's statement that "[w]e've resigned every major contract that's come up, really throughout our history." AC ¶202. Plaintiff also challenges one statement that Busky made at a May 7, 2013 conference that the Company had a "98% retention rate on our enterprise deals." AC ¶216. Plaintiff claims that "Defendants knew, but failed to disclose, that 2012 revenues had been adversely affected by the loss of major clients like Google." AC ¶¶203, 217 (citing AC ¶143).

This argument fails for several reasons. Paragraph 143 includes no allegation that (1) Google was an *enterprise* (as opposed to SMB) client, (2) InnerWorkings had any contract with

---

[2] In addition to the two statements discussed, Plaintiff alleges that on February 22, 2013, during an Investor Day event, Belcher made a statement "regarding PPM4's advantages" that was "misleading" because it "failed to disclose how production managers could easily manipulate PPM4 data." AC ¶203. None of Belcher's statements (excerpted at AC ¶202) mentions or even pertains to PPM4, however.

Google, or (3) InnerWorkings lost the enterprise business of any "major" client.[3]  Without such allegations, "Plaintiff[] [has] not demonstrated with the requisite particularity how [the alleged] omission . . . rendered any specific affirmative statements misleading."  *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 928 (S.D. Ind. 2008).  "[M]aterial omissions are actionable only if the speaker had a duty to disclose," *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011); *see also Boeing*, 711 F.3d at 759, and Plaintiff offers no reason why InnerWorkings had a duty to inform the market about the loss of Google.[4]

### d.    The Company's Class-Period Financials.

Finally, Plaintiff challenges InnerWorkings' financials, including revenue figures and gross margins for the years ended December 31, 2011 and 2012, and for Q4 2011, Q1-Q4 2012, and Q1-Q3 2013.  *See* AC ¶179.  But Plaintiff does not allege "sufficient factual matter" to plead the element of materiality, *Iqbal*, 556 U.S. at 678, because the AC does not allege the degree to which these results were inaccurate.  Although the AC notes that InnerWorkings announced a restatement on February 18, 2014, in connection with Delaune's fraudulent scheme at Productions Graphics, and issued restated financials on March 18, 2014,[5] Plaintiff fails to state what the restated revenues and gross margin numbers were.  Plaintiff also fails to show that the difference between the originally reported and restated results was material.

Accordingly, Plaintiff fails to plead that the alleged inaccuracies were material.  *See Davis*, 385 F. Supp. 2d at 709-10 (dismissing securities fraud class action where complaint failed to allege that financial impact of purported violations was material); *accord Hutchison v.*

---

[3] Moreover, the AC does not allege any specific facts to establish that Google was a "major" client of the Company, much less that Google provided a material amount of revenue to the Company's bottom-line.
[4] This allegation also fails because it relies exclusively upon the unreliable accusations of Delaune.  *See infra* Section I.D.2.
[5] The AC contains a few details regarding the Company's restated income figures, *see* AC ¶¶159-60, but Plaintiff does not challenge these figures.

*Deutsche Bank Sec. Inc*., 647 F.3d 479, 489 (2d Cir. 2011); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007); *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004).

### 2. Plaintiff Fails To Plead Facts Supporting The Strong Inference Of Scienter That The PSLRA Requires.

Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. §78u-4(b)(2), namely "scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotations omitted). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiff fails to allege facts supporting a "strong inference" of scienter as to any Defendants. Plaintiff relies chiefly upon (1) supposed "insider stock sales" by Belcher, (2) allegations that Belcher and Busky received Company stock and performance bonuses, and (3) allegations from certain CWs. Individually or collectively, these allegations do not approach the PSLRA's required showing. *See In re Career*, 2007 WL 1029092, at *3 ("Plaintiffs again ask the court to view their allegations as a whole . . . but . . . zero plus zero is zero.").[6]

### a. Belcher's Stock Sales Do Not Demonstrate Scienter.

"Because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh*, 521 F.3d at 695. For at least four reasons, the AC's allegations and incorporated public filings show nothing unusual or suspicious in Belcher's stock sales.

---

[6] Plaintiff's conclusory suggestion (AC ¶¶34-35) that the AC adequately pleads scienter because each Defendant had access to adverse, undisclosed information about InnerWorkings' business "by virtue of his high-level position with the Company" is incorrect. "Fraudulent intent cannot be inferred" from mere access to information. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004).

20

*First*, Plaintiff makes no allegation regarding sales by Busky, which weakens any inference of scienter available from Belcher's sales.  *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271-72 (S.D.N.Y. 2009) ("The fact that other insiders did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)); *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 369 (5th Cir. 2004) (same).

*Second*, all of Belcher's sales occurred pursuant to Rule 10b5-1 trading plans adopted before the sales.  *See* Ex. DD, Belcher's Forms 4.[7]  Stock sales made pursuant to such plans occur automatically and therefore are not evidence of scienter.  *See, e.g.*, *Garden City I*, 2011 WL 1303387, at *13; *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008).

*Third*, Plaintiff has not demonstrated that Belcher sold a suspicious amount of his stock holdings during the class period.  Indeed, Plaintiff has neglected to provide *any* information regarding Belcher's stock holdings during this period, an omission that alone defeats any inference of scienter.  *See Pugh*, 521 F.3d at 695; *Garden City I*, at *30; *Wade v. Wellpoint, Inc.*, 892 F. Supp. 2d 994, 1138 (S.D. Ind. 2010).  It is impossible to tell from the AC, for example, what proportion of his Company stock Belcher retained, a critical fact in alleging scienter.  *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001); *Acito*, 47 F.3d at 54.

*Fourth*, the AC fails to allege whether Belcher actually made a net profit from any of his sales.  The AC merely addresses the gross proceeds from his sales, AC ¶236, which is "insufficient to support a strong inference of scienter."  *See Garden City Emps.' Ret. Sys. v. Anixter Int'l*, 2012 WL 1068761, at *14 (N.D. Ill. Mar. 29, 2012); s*ee also Glaser v. The9, Ltd.*,

---

[7] This Court may take judicial notice of Belcher's Forms 4, which Plaintiff expressly referenced and relied upon in the AC.  *See, e.g.*, *Garden City I*, 2011 WL 1303387 at *8, *30.

772 F. Supp. 2d 573, 591-92 (S.D.N.Y. 2011); *In re Gildan*, 636 F. Supp. 2d at 270-71. For each of the foregoing reasons, Plaintiff's claims regarding Belcher's stock sales contribute nothing to Plaintiff's scienter allegations.

> **b.      Allegations That Belcher And Busky Received Company Stock And Were Eligible For Performance Bonuses Do Not Establish Scienter.**

Plaintiff also urges the Court to infer scienter from the fact that Belcher and Busky received InnerWorkings stock and options as part of their compensation and received bonus awards for meeting certain performance criteria. AC ¶¶237-41. But the Seventh Circuit recently considered and rejected such allegations:

> Plaintiffs contend that we should infer scienter because . . . top managers had an incentive to make [defendant corporation] look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options. This is too generic to satisfy *Tellabs.* A similar assertion could be made about every firm in the world, but the fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud. Quite the contrary. Managers usually do best when a firm has long-term success.

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012); *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 830 (8th Cir. 2003). Generic motive allegations that apply equally to all corporate officers do not contribute to the required, strong inference of scienter. *See, e.g.*, *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000) (rejecting motive allegations that merely illustrated "the goals of all corporate executives"); *Davis*, 385 F. Supp. 2d at 714.

> **c.      The CWs Are Inadequate To Plead Scienter.**

Nor can Plaintiff use its CWs to establish a strong inference of scienter. Again, "allegations from 'confidential witnesses' must be 'discounted'" and "[u]sually that discount will be steep." *Higginbotham*, 495 F.3d at 757. This is especially true when it comes to scienter: "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or

22

how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Id*.

Plaintiff's CW allegations do not overcome that steep discount. In addition to the deficiencies discussed above, *see supra* Section I.C.1.a, none of the CWs alleges that Defendants actually possessed any material, non-public information during the class period related to the challenged statements.

**CW1** and **CW2** do not allege any direct contact with Defendants. They both claim that their supervisors reported to Belcher but cannot point to any specific information of which their supervisors informed them. AC ¶¶72-79. That these CWs say nothing about what Defendants actually knew "render[s] their scienter allegations insufficient as a matter of law." *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *11 (S.D.N.Y. Mar. 28, 2013) (collecting cases).[8]

**CW3** claims that Belcher and Busky "would have had financial access to PPM4 reports generated by inside sales." AC ¶80. But the AC contains no pertinent information about the nature of the alleged PPM4 data, what the data reflected, and if and when the data were ever actually accessed by Belcher and Busky. *See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 2011 WL 338865, at *21 (S.D. Ind. Jan. 28, 2011) ("Access to information is not the same as actually possessing the specific information and knowing it so as to render subsequent contrary representations false."), *aff'd*, 679 F.3d 952 (7th Cir. 2012). CW3 also claims that on one occasion "[he] was told" that Busky would not release the funds to pay for a vendor's invoice "because 'quarterly earnings reports' were due," AC ¶177, but CW3's vague hearsay allegation does not suggest he was in a position to know that Busky did anything that would contribute to an inference of scienter. *See, e.g.*, *Pipefitters Local No. 636 Defined*

---

[8] *See also Wade*, 740 F. Supp. 2d at 1009-10 (finding complaint failed to allege scienter where "the vast majority of Plaintiff's 19 CWs . . . [had] nothing to say regarding any specific Defendant's knowledge").

*Benefit Plan v. Tekelec*, 2013 WL 1192004, at *18 (E.D.N.C. Mar. 22, 2013).

And while **CW4** alleges that "each [SMB] manager tracked their team's projects and all the information related to sales quotas in [InnerWorkings'] CRM tool," this witness does not contend that Belcher and Busky had access to such information.  AC ¶81.

**CW5**, apart from generalized statements that he spoke to Belcher about his team's "growing pains," contends nothing about what Defendants knew during the class period.  AC ¶82.  Like CW3, CW5 falls back on generic allegations that "Belcher and Busky had access" to information regarding "SMB quotas and sales," AC ¶83, without explaining (1) what this information reflected, and (2) whether Defendants ever accessed it.  Such allegations are insufficient.  *See In re Harley Davidson, Inc., Sec. Litig.*, 660 F. Supp. 2d 969, 999 (E.D. Wis. 2009) (no inference of scienter where "the Complaint does not charge that each defendant actually received and reviewed the statistical information said to be in the reports prior to making their allegedly misleading public statements").

**CW6** claims that Belcher "must have had awareness" of SMB's performance because Belcher "was a big believer and backer of SMB."  AC ¶85.  Putting aside the fact that CW6 fails to allege what Belcher knew and when, however, it is well-established that conclusory allegations regarding what defendants "must have known" do not contribute to even a weak inference of scienter, let alone the strong inference that the law requires.  *See Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir. 1990); *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006).

**CW7** relays a second-hand account regarding InnerWorkings' efforts to sign a prospective enterprise client.  CW7 purportedly "learned" from an unknown source that InnerWorkings had created a mock design studio to impress the prospective client during a tour

of the Company's headquarters. AC ¶¶88-89. Although CW7 characterized the alleged incident as "shady" and a "deception," CW7 does not explain how the alleged attempt to make a successful pitch to a prospective client was deceptive to investors on public markets. Aggressive sales practices "do not by themselves raise a strong inference of scienter." *Janbay,* 2013 WL 1287326, at *12. Nor does CW7 offer first-hand knowledge that either Belcher or Busky knew about the alleged incident. *See Karam v. Corinthian Colleges, Inc.*, 2012 WL 8499135, at *13 (C.D. Cal. Aug. 20, 2012) (no inference of scienter where "much of the supposedly improper conduct reported by [a CW] [did] not appear to be based on [his] personal knowledge, but on opinion and vague hearsay").

CW8 and **CW9** proffer nothing specific about what Belcher and Busky knew during the class period. CW8 states only that "Busky was present at . . . monthly business meetings . . . attended by managers from all [InnerWorkings] divisions" and CW9 notes merely that he "exchanged many emails with Busky during his tenure." AC ¶¶93, 122. Likewise, **CW10** offers just empty metaphors: "Belcher and Busky had their hands on everything and 'ke[pt] their cards close to their vests.'" AC ¶124. And **CW11**, **CW12**, and **CW14** do not even mention Belcher and Busky, much less suggest what they knew during the class period. AC ¶¶164-72, 178.

Finally, **CW13**, a purported former senior VP that left the Company in March 2012, relates an anecdote from early 2011 in which Belcher allegedly told him that the Company sometimes had to "fudge the numbers" for the good of the business. AC ¶¶175-76. This generalized and uncorroborated statement—about a conversation that purportedly occurred in connection with a client meeting a year before the class period started—does not suggest that Belcher possessed any facts that contradicted the statements he made during the class period. *See City of Roseville Emps.' Ret. v. Sterling*, 963 F. Supp. 2d 1092, 1135-36 (E.D. Wash. 2013).

Thus, Plaintiff's CWs are insufficient to establish any inference, much less a "compelling" inference of scienter as to the challenged statements.

* * *

In short, Claim I fails to adequately plead fraud regarding the Company's inside sales division, the internationalization of PPM4, the enterprise client retention rate, or the Company's class-period financials. The AC does not meet the legal requirements for alleging that the statements underlying these claims are materially false, and Plaintiff independently fails to satisfy the PSLRA's standard for pleading a strong inference of scienter.

### D.  Count I Fails To State A Claim Regarding Productions Graphics.

Throughout the AC, Plaintiff extensively quotes statements from Delaune – the admitted perpetrator of a fraud against the Company – to create the erroneous impression that Belcher and Busky directed Delaune to conduct a false-invoicing scheme involving Productions Graphics, *see* AC ¶¶125-58, and that Belcher and Busky made false or misleading statements about the performance of Productions Graphics during the putative class period, *see* AC ¶¶ 179-230. These allegations fail on two independent grounds: (1) Plaintiff has not properly pled a strong inference of scienter, and (2) Plaintiff has not adequately alleged that any of the challenged statements was materially false or misleading.

#### 1.  Plaintiff Fails To Plead The Strong Inference Of Scienter That The PSLRA Requires.

A securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). A complaint will not survive unless "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The more compelling inference to be drawn from the AC is

26

not that Belcher and Busky inexplicably engaged in a scheme that hurt the Company's bottom line, but that Delaune defrauded InnerWorkings, was fired, and upon revelation of his crimes, was referred by the Company for criminal prosecution in France. Delaune is now attempting to slander Belcher and Busky out of spite and to deflect blame from himself in connection with the pending criminal inquiry into his actions at Productions Graphics. But he offers no documentary or other corroboration for his allegations, which contradict facts pled elsewhere in the complaint and defy common sense.

**a.**      **Delaune's Allegations Do Not Contribute To An Inference Of Scienter.**

Plaintiff bases his claims regarding Productions Graphics on Delaune, who (1) admitted to defrauding the Company, (2) had a clear financial motive to commit the fraud, (3) has a strong motive to fabricate accusations against Belcher and Busky, and (4) gave an internally inconsistent and facially implausible account of how Belcher and Busky allegedly "directed" him to commit a fraud that required the Company to *lose* money to Delaune. Courts must discount information obtained from CWs because these sources may "have axes to grind," or might be "lying." *Higginbotham*, 495 F.3d at 757. Here, Delaune is much *less* credible than an anonymous CW. He is an admitted fraudster and liar who has an obvious axe to grind with InnerWorkings, the company that fired him and exposed him to criminal charges as a fraud. In short, the inference that Belcher and Busky were complicit in Delaune's admitted fraud is far less "compelling" than the "opposing inference."

**Delaune "does not contest" the fact that he criminally defrauded InnerWorkings.** To support Delaune's allegations, Plaintiff references and attaches as Exhibit 5 to the AC a certified translation of Delaune's "Note to the Public Prosecution for the Republic," (the "Delaune Declaration") which allegedly "recounts Belcher's and Busky's roles in the fraudulent

27

invoicing scheme." AC ¶ 154 n.11. The subject line indicates that the Delaune Declaration was submitted to the High Court in Paris in connection with a complaint filed by InnerWorkings on February 26, 2014 (the "Criminal Complaint" or "CC"). Delaune Dec., at 1. Delaune states that he "has taken note of this complaint (but not the attached documents)," and "*he does not contest the substance of the facts stated therein.*" *Id.* (emphasis added). Because (i) Delaune's allegations are central to the AC, (ii) the declaration has been incorporated by reference into the AC, and (iii) the declaration references the Criminal Complaint directly, Defendants have attached the Criminal Complaint and a certified translation of that document as Exhibit EE to this memorandum to permit the Court to assess Delaune's allegations properly.[9]

The Criminal Complaint, whose substance Delaune "does not contest," provides that:

- InnerWorking's investigation into Delaune's conduct found that "Mr. Delaune had tricked InnerWorkings into paying him an earn-out by artificially inflating the PG Group's revenues in 2011 and 2012." Ex. EE, CC at 3.
- "[W]ith respect to at least nine entities, Mr. Delaune had fraudulently issued fictitious invoices for services that were never rendered." *Id.*
- "To conceal the fraudulent nature of his invoices, Mr. Delaune sent funds to those entities or, in some cases, to third parties, in order to have the fictitious invoices paid." *Id.*
- The investigation "serious indicia of fraud in connection with over 180 transactions between entities of the PG Group managed by Mr. Delaune and 16 other entities" *Id.*
- Productions Graphics CFO Jean-Philippe Calzolari contributed to the fraud as early as the spring of 2012. *Id.* at 4.
- "Mr. Delaune had more than 180 suspicious invoices issued involving 16 entities, amounting to approximately €4,984,000. This revenue is therefore entirely or partly fictitious and was therefore artificially created by Mr. Delaune." *Id.* at 8.
- Delaune should not have received the payment of his earn-out provided in the SPA for the fiscal years 2011 and 2012. *Id.*

[9] *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Alito, J.) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."); *see also Kramer v. Time Warner*, *Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Additionally, this Court may take judicial notice of the allegations contained in the Criminal Complaint because the document is a pleading in a formal judicial proceeding. *See*, *e.g.*, *Woltring v. Specialized Loan Servicing, LLC*, 2014 WL 2708581, at *2 (E.D. Wis. June 16, 2014).

- "[E]ver since his removal, Mr. Delaune has never stopped attempting to cause harm to InnerWorkings, by trying to disorganize it and by threatening it." *Id.*

- In January 2014, months after his termination, Delaune "sent to the accountants of several subsidiaries of InnerWorkings France a letter under the terms of which he claims to be the president and corporate officer of those subsidiaries, mentions his intent to liquidate them by court order and asks for information for this purpose." *Id.*

- Delaune's actions "constitute the offenses of fraud and forgery and use of forged documents, fraudulent use of corporate property and blackmail. . . ." *Id.* at 9.

**Unlike Defendants, Delaune had a financial motive to commit fraud.** Under the SPA, the earn-out payments Delaune stood to receive exceeded the earnings targets required to trigger those payments, and the annual increases in the earn-out payments substantially outpaced the corresponding increases in the earnings targets. The SPA provided that if Productions Graphics achieved EBITDA of €1,000,000 or more during 2011, then Delaune and Winthrop Limited would be entitled to receive €1,200,000; if Productions Graphics achieved EBITDA of €2,300,000 or more during 2012, then Delaune and Winthrop Limited would be entitled to receive *more than two-and-a-half times* that amount, €5,900,000. Ex. B, SPA at 2. This disparity, coupled with the fact that Productions Graphics already had a base of legitimate sales, allowed Delaune to generate €6.93 million in fictitious sales to obtain €7.1 million in earn-outs. Ex. EE, CC at 2. Had Delaune not been terminated and continued with his scheme, he stood to gain several million Euros in illicit income in the upcoming years. For someone in Delaune's position willing to commit fraud—as he admits he was—the benefits far exceeded the costs.

But the opposite was true for InnerWorkings, which would have been better off had Productions Graphics just missed its earnings targets, even if the sales that Delaune falsified had been *real*. Delaune admits to creating €6.93 million in fictitious sales between 2011 and 2012, in exchange for which the Company paid him €7.1 million. *Id.* It is implausible that Belcher and Busky—who are accountable for the Company's bottom line—would have risked criminal

29

penalties (not to mention loss of their livelihoods) to participate in a scheme whereby the Company paid out more than it even appeared to gain.

**Delaune had a clear motive to spread lies about his former employers**. Delaune not only had a motive to inflate his sales figures, but he also has reason to fabricate his current claim that Belcher and Busky were parties to his fraud. Courts discount the testimony of CWs because these witnesses may have "axes to grind," *Higginbotham*, 495 F.3d at 757, but Delaune's claims are entitled to even less weight, for he has multiple, compelling motives to falsely incriminate Defendants. InnerWorkings fired him from the company he founded, he lost the opportunity to receive millions of Euros in compensation, and the Company's internal investigation exposed him as a fraudster.

Delaune also has legal reasons to fabricate his story. He has sued InnerWorkings for wrongful termination, seeking approximately €0.7 million in fees and damages, *see* Ex. CC, 3/18/14 10-K, at 53, and it can only help those claims if he can paint Belcher and Busky as the architects of his fraud. And Delaune has even more to gain by lying in connection with the French authorities' pending criminal inquiry into his actions at Productions Graphics. As Delaune faces prosecution, there are obvious advantages in portraying others as the masterminds behind his misconduct.

**Delaune's allegations in the AC are inconsistent.** The AC alleges (at ¶132) that Belcher first suggested the fraudulent scheme to Delaune in Paris in July of 2012. But the Criminal Complaint, whose factual allegations Delaune "does not contest," Delaune Dec. at 1, makes clear that Delaune's fraud started in 2011, Ex. EE, CC at 3-5, long before Belcher supposedly approached him. Indeed, Plaintiff also acknowledges in its complaint (AC ¶¶159-60) that InnerWorkings restated its financials for 2011, something the Company would not have

done unless Delaune had falsified sales for that year, too.  Against these verifiable inconsistencies, Plaintiff offers nothing but Delaune's own allegations, without documentary or other corroboration that Defendants participated in his fraud.

**The Only Reasonable Inference To Draw From Delaune's Allegations Is That InnerWorkings Was A Victim Of his Fraud.**  Plaintiff offers no logical motive for Defendants to direct Delaune to commit fraud in the middle of July 2012—to the detriment of  the Company's bottom-line—only to reveal the fraud to the investing public just over a year later.  Rather, the only common sense, reasonable inference, is that Defendants were blindsided by Delaune's conduct and were themselves victims of his deception.  *See In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 481 (S.D.N.Y. 2013) (no inference of scienter where "[t]he majority of the allegations in the complaint concern an intricate and well-concealed fraud perpetrated by a very small group of insiders and only reinforce the inference that the [defendants] were themselves victims of the fraud"); *S.E.C. v. Cohmad Sec. Corp.*, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) (dismissing section 10(b) claims for lack of scienter where complaint alleged "reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators").

### b.    Calzolari's Allegations Do Not Establish Scienter.

In an attempt to corroborate Delaune's allegations, Plaintiff attaches as Exhibit 6 to the AC a declaration by Delaune's accomplice in the fraud, Jean-Philippe Calzolari, the former CFO of Productions Graphics (the "Calzolari Declaration").  AC ¶ 154 n.12  All that the declaration corroborates, however, is that Delaune "set up a scheme" to commit fraud and that Calzolari agreed to be his accomplice.  Calzolari Dec. at 1.  As with Delaune, this Court should view the word of an admitted fraudster with extreme skepticism.  *Higginbotham*, 495 F.3d at 757.  And Calzolari further discredits himself by claiming that the alleged fraud began in July of 2012, *id.*,

31

while the Criminal Complaint and 2011 restatement both show that the fraud began in 2011. *See supra* at pp. 30-31. Indeed, emails attached to the Criminal Complaint reflect that Calzolari directly participated in Delaune's false-invoicing scheme as early as March 2012. *See* Exs. FF and GG. Just as Delaune's unsubstantiated allegations do not contribute to an inference—much less a strong inference—of scienter, neither do those of his accomplice.

### c. CW Allegations Do Not Establish Scienter.

Not one of Plaintiff's CWs corroborates Delaune's allegations that Belcher and Busky were complicit in Delaune's fraud. *See* AC ¶¶72-93, 105, 121-24, 164-74, 175-78. The handful of CWs who do make generalized comments about Productions Graphics do not allege any specific information known to Belcher and Busky during the class period, and these allegations therefore suggest nothing about Defendants' scienter. *See Janbay*, 2013 WL 1287326, at *12; *Wade*, 740 F. Supp. 2d at 1009-10. **CW9** alleges that "Delaune met with [InnerWorkings'] executives, and [spoke] with them, on a regular basis," but does not provide any details regarding the contents of those alleged conversations, much less suggest they involved fraud. AC ¶¶121-23. **CW11** states that Productions Graphics did not use PPM4 during the class period, but he does not even mention Busky or Belcher in his allegations. AC ¶¶164-67. And while **CW8** and **CW10** state that Busky and Belcher sometimes travelled to France (with CW10 speculating that "he believed Belcher spoke often with Delaune"), again, these vague allegations say nothing about Delaune's fraud. AC ¶¶93, 124. Once again, Plaintiff's CWs add nothing, much less support a "compelling" inference of scienter.

### d. Plaintiff's Remaining Allegations Do Not Establish Scienter.

Plaintiff's scienter allegations, discussed above in Section I.C.2, do not support a strong inference of scienter. Section I.C.2 is incorporated herein by reference.

32

### 2. Plaintiff Fails To Plead Material Falsity.

Delaune's and Calzolari's allegations are the sole basis for Plaintiff's claim that

Defendants' statements about Productions Graphics were false. Because these allegations are

not reliable for the reasons stated above, *see* pp. 26-32, Plaintiff fails to adequately plead falsity.

\* \* \*

As demonstrated above, Claim I fails to adequately plead that Defendants were involved

in a false-invoicing scheme involving Productions Graphics. The AC does not satisfy the

PSLRA's standard for pleading a strong inference of scienter as to this claim, and fails to meet

the legal requirements for alleging that the statements underlying this claim are materially false.

### E. Certain Forward-Looking Statements Are Protected By The PSLRA.

Count I also fails because many of the statements that Plaintiff challenges, catalogued in

Exhibit A, are protected by the PSLRA's safe harbor for forward-looking statements. 15 U.S.C.

§78u-5(c). Under that rule, a defendant's statement is not actionable in a private suit if the

statement is: (a) identified as forward-looking and (b) "accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from

those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A)(i). Courts routinely apply

the safe harbor to dismiss cases on the pleadings. *See, e.g.*, *In re Midway Games, Inc. Sec. Litig.*,

332 F. Supp. 2d 1152, 1167 (N.D. Ill. 2004); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 852-

53 (N.D. Ill. 2003); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 954 (N.D. Ill. 2003).

The AC's erroneous allegation that the safe harbor "does not apply" to InnerWorkings'

forward-looking statements, AC ¶252, is a legal conclusion that the Court is not bound to accept.

*Iqbal*, 556 U.S. at 678. Further, despite Plaintiff's claim to the contrary, AC ¶254, the safe

harbor applies without regard to a defendant's alleged state of mind. *See, e.g.*, *Desai v. Gen.*

*Growth Props., Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009) ("the author of any forward-

33

looking statement—even though a deliberate falsehood—is insulated from liability").[10]

### 1.     The Statements Were Forward-Looking.

The safe harbor defines a forward-looking statement to include: "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items"; "a statement of the plans and objectives of management for future operations"; "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations"; and "any statement of the assumptions underlying or relating to any [of the foregoing]." 15 U.S.C. §78u-5(i)(1)(A)-(D).  Many of the statements Plaintiff challenges clearly meet those definitions.  (*See, e.g.*, AC ¶¶179, 183, 187, 191, 194, 197, 202, 206, 209, 216, 219, 225.)  Thus, InnerWorkings' projections of its future growth and performance, including all of the Company's statements on revenue and gross margin guidance (AC ¶179), were forward-looking statements for purposes of the statutory safe harbor.  *See Elec. Workers Pension Trust Fund of IBEW Local Union v. CommScope*, 2013 WL 4014978, at *10 (W.D.N.C. Aug. 6, 2013).

### 2.     The Statements Were Accompanied By Meaningful Cautionary Language.

Courts consider cautionary language that accompanied the statements at issue, was incorporated by reference, and was publicly available.  *See, e.g.*, *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004).  Here, each of InnerWorkings' forward-looking statements was accompanied by meaningful cautionary language.  As an initial matter, all of InnerWorkings' press releases during the class period contained "safe harbor statements":

> This release contains statements relating to future results. These statements are
> forward-looking statements under the federal securities laws.  We can give no

---

[10] *See also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796 (11th Cir. 2010); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010); *St. Lucie*, 2011 WL 814932, at *9; H.R. Rep. No. 104-369, at 44 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 743.

assurance that any future results discussed in these statements will be achieved. Any forward-looking statements represent our views only as of today and should not be relied upon as representing our views as of any subsequent date. These statements are subject to a variety of risks and uncertainties that could cause our actual results to differ materially from the statements contained in this release. For a discussion of important factors that could affect our actual results, please refer to our SEC filings, including the 'Risk Factors' section of the Form 10-K we recently filed with the SEC.

*See, e.g.*, Ex. E, 5/3/12 8-K; Ex. H, 8/9/12 8-K; Ex. L, 11/8/12 8-K; Ex. O, 2/13/13 8-K; Ex. T, 4/16/13 8-K; Ex. V, 5/9/13 8-K; Ex. AA, 11/6/13 8-K. InnerWorkings' press releases also incorporated the Company's SEC filings, which included multiple additional warnings, such as:

- "A significant portion of our revenue is derived from a relatively limited number of large clients and any loss of, or decrease in sales to, these clients could harm our results of operations," Ex. D, 3/7/12 10-K at 7;

- "We may face difficulties as we expand our operations into countries in which we have limited operating experience," *id.* at 8;

- "If we are unable to expand our enterprise client base, our revenue growth rate may be negatively impacted," *id.* at 9;

- "If we are unable to attract new enterprise clients or expand our relationships with our existing transactional clients, our ability to grow our business will be hindered," *id.*;

- "Many of our clients may terminate their relationship with us on short notice and with no penalties or limited penalties," *id.*;

- "We may not be able to develop or implement new systems . . . that are required to support the anticipated growth in our operations," *id.*;

- "Our business is subject to seasonal sales fluctuations," *id.* at 10;

- "[w]e may not be able to . . . effectively integrate newly acquired businesses or achieve expected profitability from acquisitions," *id.*; and

- "[Q]uarterly results are difficult to predict and may vary from quarter to quarter," *id.* at 11.

InnerWorkings' 10-Ks and 10-Qs contained safe harbor statements similar to those contained in the Company's press releases. *See* Ex. D, 3/7/12 10-K; Ex. G, 5/7/12 10-Q; Ex. I, 8/9/12 10-Q; Ex. M, 11/8/12 10-Q; Ex. R, 2/28/13 10-K; Ex. W, 5/10/13 10-Q; Ex. Z, 8/9/13 10-Q.

35

Likewise, at the beginning of each conference call, the Company read a cautionary statement similar to the one quoted above. *See* Ex. C, 2/14/12 TR; Ex. F, 5/3/12 TR; Ex. J, 8/10/12 TR; Ex. N, 11/8/12 TR; Ex. P, 2/13/13 TR; Ex. X, 5/10/13 TR; Ex. Y, 8/8/13 TR. And such statements also were given when the Company spoke at investor events. *See* Ex. K, 9/13/12 TR at 1; Ex. Q, 2/22/13 at 2; Ex. S, 3/11/13 TR at 7; Ex. U, 5/7/13 TR at 1.

The foregoing cautionary statements were "meaningful" under the PSLRA. Meaningful cautionary language is "substantive and tailored to the specific predictions made in the allegedly misleading statement." *Johnson*, 262 F. Supp. 2d at 952-53. The language need not refer explicitly to the risk that ultimately caused the projection to differ from the results. *Asher*, 377 F.3d at 730; *Stavros*, 266 F. Supp. 2d at 843. It is only necessary to "convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements." *Stavros*, 266 F. Supp. 2d at 843 (internal citation omitted). Yet InnerWorkings' warnings—which addressed risks associated with efforts to obtain new transactional business, integrating newly acquired businesses, and the potential loss of major customers—cautioned investors about precisely the risks that Plaintiff now claims materialized.

**F.      Several Of The Challenged Statements Were Immaterial Puffery.**

Count I of the AC fails for the additional reason that many of the challenged statements (catalogued in Exhibit A) were mere "puffery"—"loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games*, 332 F. Supp. 2d at 1164; *see also Conlee v. WMS Indus., Inc.*, 2013 WL 1767648, at *6 (N.D. Ill. Apr. 24, 2013) (dismissing complaint with prejudice and holding that "[m]ere puffery . . . such as Defendants touting their 'intense focus' and 'vigilance' in executing

36

the operational improvements will not suffice"); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d

862, 887 (S.D. Tex. 2002) (holding that defendant company's statement that its "pipeline of

private transactions and announced public tenders remains very strong" was inactionable

puffery); *see, e.g.*, AC ¶¶183, 187, 191, 194, 197, 202, 206, 209, 216, 219, 225.

* * *

In sum, the claims in Count I fail on multiple, independent grounds. Plaintiff lacks

standing to challenge many of the statements on which this count relies, the AC fails to satisfy

the PSLRA's rigorous pleading standards, Plaintiff fails to adequately plead material falsity and

scienter, and many of the challenged statements are forward-looking statements protected by the

PSLRA's safe harbor, mere puffery, or both.

## II.    COUNT II SHOULD BE DISMISSED.

Count II, which raises claims under Rule 10b-5(a) and (c) fails as a matter of law. To

state a securities fraud claim under these provisions, Plaintiff must allege: (1) deceptive or

manipulative acts; (2) committed by Defendants with scienter; (3) that affected the market for

securities; and (4) caused Plaintiffs' injuries. *Last Atlantis Capital LLC v. Chi. Bd. Options*

*Exch., Inc.*, 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006). Plaintiff fails to meet these pleading

requirements because (1) Plaintiff pleads no deceptive or manipulative act apart from the alleged

misrepresentations and omissions in Count I, and (2) Plaintiff cannot establish scienter.

### A.    The AC Lacks Any Description Of Defendants' "Deceptive Or Manipulative Acts" That Distinguishes Count II From Count I.

Count II of the AC fails to give Defendants "fair notice" of the claim asserted. *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Count II reincorporates all of the

preceding paragraphs of the AC—268 paragraphs over 106 pages—without indicating how (if at

all) this count differs from Count I. AC ¶269. "To incorporate [268] paragraphs into Count II by

37

a one-paragraph reference, and then to expect Defendants and this Court to pluck out precisely which of those is now asserted to be crucial to understanding Count II's allegations, flouts the requirement to provide 'fair notice' of the claim asserted." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 861-62 (N.D. Ill. 2009) (dismissing Rule 10b-5(a) and (c) claim).

Insofar as Plaintiff is re-pleading the same insufficient allegations in Count I, and addressed above, *see* Section I, Count II fails as duplicative. *See, e.g.*, *In re Redback Networks, Inc. Sec. Litig.*, 2006 WL 1805579, at *5 (N.D. Cal. Mar. 20, 2006) (dismissing Rule 10b-5(a) and (c) claims as duplicative of misstatements and omissions claims in another count); *see also Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b–5(b)"); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005).

Moreover, the AC's only hint as to the nature of the alleged scheme is that it "included the knowing and/or reckless *suppression* and *concealment* of information regarding [InnerWorkings'] business, inside sales division, and Productions Graphics subsidiary." AC ¶273 (emphasis added). But "[i]f concealment were sufficient, every 10b–5–(b) violation could be charged as a 10(b)5–(a) and (c) violation as well," for concealment "is an inherent part of every illicit scheme." *S.E.C. v. Benger*, 931 F. Supp. 2d 908, 915 (N.D. Ill. 2013). Because Plaintiff fails to explain how the scheme alleged in Count II differs from the misrepresentations and omissions alleged in Count I, Count II must be dismissed.

### B. Count II Does Not Adequately Support A Strong Inference Of Scienter.

Scienter is a required element for pleading a claim pursuant to Rule 10b-5(a) and (c). *Last Atlantis*, 455 F. Supp. 2d at 793. For the same reasons that Plaintiff fails to allege a strong

inference of scienter in connection with Count I, *see supra* Sections I.C.2 and I.D.1, Plaintiff

fails to do so in connection with Count II.

## III.    COUNT III SHOULD BE DISMISSED.

Plaintiff's Count III, against the individual defendants for control person liability under

Section 20(a) of the Exchange Act, also should be dismissed.

### A.    Plaintiff Fails To Allege An Underlying Violation Of Securities Law.

Count III necessarily fails with the dismissal of Counts I and II.  "[T]o state a claim under

§ 20(a), a plaintiff first must adequately plead a primary violation of securities laws—here, a

violation of § 10(b) and Rule 10b-5."  *Pugh*, 521 F.3d at 693; *see also St. Lucie*, 2011 WL

814932, at *13.  The Court should dismiss Count III on this ground alone.

### B.    Plaintiff Fails To Allege General Or Specific Control.

Plaintiff also fails to plead a Section 20 claim on its own terms.  A plaintiff alleging a

control person violation must adequately plead that the alleged control person (1) "*actually*

exercised general control over the operations of the wrongdoer," and (2) "had the power or

ability—even if not exercised—to control the specific transaction or activity that is alleged to

give rise to liability."  *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th

Cir. 1994); *see also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 949 (7th Cir. 1989).  Plaintiff must

satisfy Rule 9(b)'s particularity requirement in pleading both elements.  *Johnson v. Tellabs, Inc.*,

262 F. Supp. 2d 937, 958 (N.D. Ill. 2003).  Plaintiff fails as to each.

With regard to general control, Plaintiff may not merely point to the individual

defendants' "high-level positions," "ownership and contractual rights," and "participation in

and/or awareness of the Company's core operations."  AC ¶279; *see also* AC ¶¶34-39; *see, e.g.*,

*Davis v. Coopers & Lybrand*, 787 F. Supp. 787, 801 (N.D. Ill. 1992), *abrogated on other*

*grounds by Damato v. Hermanson*, 153 F.3d 464, 469-70 (7th Cir. 1998). In *Davis*, for example, the court explained that neither the "plaintiff's allegations that the various defendants were either 'principals,' officers or directors of S Funds or any of the other corporate entities," nor "their conclusory allegations about claimed controlling person status" sufficed to establish control person liability. *Id.* at 801-02. Many courts have reached the same conclusion.[11]

Plaintiff also must plead specific control—that the alleged control person "had the power or ability . . . to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911-12. Plaintiff, however, fails to allege any facts describing an individual Defendant's alleged control over any of the underlying, challenged statements—with the exception of that Defendant's own statements. Accordingly, as to any statements not made specifically by that Defendant, Plaintiff's allegations of control person liability are deficient.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the AC with prejudice.


Dated:  September 29, 2014                    Respectfully submitted,

Elizabeth A. Coleman (Illinois Bar #6236597)    InnerWorkings, Inc., Eric D. Belcher, and
Howard S. Suskin (Illinois Bar #6185999)        Joseph M. Busky
JENNER & BLOCK LLP
353 N. Clark Street                             By:  /s/  Howard S. Suskin                 
Chicago, IL 60654-3456                               One of Their Attorneys
(312) 222-9350

*Attorneys for Defendants*

---

[11] *See, e.g.*, *Waldock v. M.J. Select Global, Ltd.*, 2005 WL 3542527, at *7 (N.D. Ill. Dec. 27, 2005); *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003).