# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Peter Ikai Van Noppen, | |
| Plaintiff, | Case No. 14 C 1416 |
| v. | |
| InnerWorkings, Inc., Eric Belcher and Joseph Busky, | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Peter Van Noppen, individually and on behalf of all others who purchased InnerWorkings, Inc. ("InnerWorkings") common stock between February 15, 2012 and November 6, 2013, brings this action for securities fraud against InnerWorkings and two of its executives, CEO Eric Belcher and CFO Joseph Busky. Plaintiff alleges violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants now move to dismiss [41] the three-count Amended Complaint [38] in its entirety. That motion is granted in part and denied in part. Plaintiff may proceed with Counts I to III with respect to the statements about Productions Graphics and InnerWorkings' putative class period financials. Conversely, Plaintiff cannot proceed with Counts I to III with respect to the statements about the inside sales group, the internationalization of PPM4 and the enterprise client retention rate.

# I.    Legal Standard

Under Rule 12(b)(6), this Court must construe the Amended Complaint in the light most favorable to Plaintiff, accept as true all well-pleaded facts and draw reasonable inferences in his favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of law, however, need not be accepted as true. *Yeftich*, 722 F.3d at 915. Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

To survive Defendants' motion under Rule 12(b)(6), the Amended Complaint must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

More is required from plaintiffs in actions for securities fraud than is typically required at the motion to dismiss stage. The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), raises the pleading standard for securities fraud claims beyond the requirements of even Rule 9(b). *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs I*"), 437 F.3d 588, 594 (7th Cir. 2006), *vacated*, 551 U.S. 308 (2007); *Conlee v. WMS Industries, Inc.* ("*Conlee II*"), No. 11-3503, 2013 WL 1767648, at *3 n.1 (N.D. Ill. April 24, 2013); *Garden City Employees'*

*Retirement System v. Anixter International, Inc.* ("*Garden City II*"), No. 09-5641, 2012 WL 1068761, at *2 (N.D. Ill. March 29, 2012). In this way, the PSLRA acts as a "check against abusive litigation by private parties," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs II*"), 551 U.S. 308, 313 (2007), as Congress implemented the statute's exacting pleading requirements "to screen out frivolous suits, while allowing meritorious actions to move forward," *id.* at 313, 324. In charging misrepresentations or omissions of material fact, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

## II. Facts

### A. InnerWorkings' Business

InnerWorkings, a global company based in Chicago, Illinois, provides print management and promotional solutions to corporate clients. Amended Complaint ("AC") ¶¶ 2, 16, 30. InnerWorkings procures printed products from suppliers and sells those products to clients. AC ¶ 3. "Enterprise" clients—with whom InnerWorkings contracts to provide some or substantially all of their printed products on a recurring basis—accounted for 70 to 75 percent of the Company's revenue during the putative class period. AC ¶¶ 3, 45, 50. The putative class period is from February 15, 2012 to November 6, 2013. AC ¶ 242. Conversely, "middle market" clients, also known as the "small to medium-sized business market" or "SMB," accounted for 25 to 30 percent of revenue during the putative

class period.  AC ¶¶ 3, 38, 46.  As of December 31, 2012, InnerWorkings achieved annual revenue of approximately $800 million and operated globally.  AC ¶¶ 30, 40.

During the putative class period, InnerWorkings used a proprietary software system known as "PPM4," which stored, analyzed and tracked the production capabilities of the Company's supplier network in the United States.  AC ¶ 43. PPM4 enabled InnerWorkings to gather job specifications, identify suppliers, establish pricing, manage print production and coordinate purchase and delivery of the finished product.  AC ¶ 43.

### B.    Inside Sales

During the second half of 2010, InnerWorkings began testing and investing in a new telesales project, dubbed "inside sales."  AC ¶ 61.  The purpose of inside sales was to generate new SMB clients through an in-house cold-call center.  AC ¶ 6.  After an initial testing period of 18 months, InnerWorkings was encouraged by the project's preliminary results.  AC ¶ 61.  In February 2012, the Company announced plans to expand the inside sales group, expecting that its workforce would more than triple, from 60 to 200 sales representatives, by the end of 2012. AC ¶ 61.  Although the project was not profitable at the time, InnerWorkings stated its expectation that it would become profitable in 2013.  AC ¶ 61.

Over the remainder of 2012 and during the first half of 2013, InnerWorkings reiterated its expectation that the Company's continued investment in inside sales would prove successful.  *E.g.*, AC ¶¶ 183, 187, 194, 202, 206, 216.  This action for securities fraud concerns many of those statements.  For example, during the

November 8, 2012 earnings call, InnerWorkings' CEO Eric Belcher stated that the project represented a "huge opportunity for the Company" and that the Company was "laying the groundwork" for future success. AC ¶ 194. Likewise, at a May 7, 2013 investor conference, InnerWorkings' Vice President of Corporate Development Brad Moore noted that although inside sales represented "still a relatively small portion of the overall revenue of the Company, and still an overall small portion of the middle-market business for us," the Company believed that the project would become the future "driver for us in this segment of the business." AC ¶ 216.

During the August 8, 2013 earnings call, however, Belcher announced that the inside sales group's performance during Q2 2013 had not met InnerWorkings' expectations and that the Company was rethinking its "bigger picture strategic ideas for the group." AC ¶ 225; 8/8/13 Earnings Call Tr. [43-26] at 4, 7. In the same call, Belcher stated that InnerWorkings had made changes to the inside sales group's management and was looking to align with a partner to bolster the Company's SMB client-acquisition capability going forward. AC ¶ 225; 8/8/13 Earnings Call Tr. [43-26] at 4. Belcher acknowledged that InnerWorkings "had some learnings along the way, which I guess in hindsight would be anticipated, always the case when you try something new and bold like this." AC ¶ 225.

## C. Productions Graphics

On October 24, 2011, InnerWorkings acquired all of the securities of Productions Graphics through a Share Purchase Agreement. AC ¶¶ 102, 104. Productions Graphics was a print management firm based in France with

operations in 12 countries and 2011 sales of $30 million that was primarily driven by enterprise clients. AC ¶ 102. At the time of its acquisition, Productions Graphics was fully held by Christophe Delaune, CEO of Productions Graphics, and Winthrop Limited ("Winthrop"), an organization affiliated with Delaune. Share Purchase Agreement at 1, attached to 10/25/11 8-K [43-3]; 2/18/14 8-K [43-29] at 2. Delaune signed a long-term contract with InnerWorkings, agreeing to serve as President of Productions Graphics going forward. AC ¶¶ 8, 116.

Pursuant to the Share Purchase Agreement, InnerWorkings' acquisition of Productions Graphics was valued at €67,911,000. AC ¶ 8; Share Purchase Agreement at 2, attached to 10/25/11 8-K [43-3]. Only a small portion of the deal's value—8%, or €4,191,000—was paid upfront to Delaune and Winthrop. AC ¶ 8; Share Purchase Agreement at 2, attached to 10/25/11 8-K [43-3]. InnerWorkings was to pay the remainder in the form of "earn-outs" only if Productions Graphics met certain financial milestones over a four-year period. AC ¶ 8; Share Purchase Agreement at 2, attached to 10/25/11 8-K [43-3]. In 2011 and 2012, Productions Graphics initially appeared to exceed those targets. Consequently, Delaune and Winthrop obtained their payments for those first two periods: 1.2 million euros and 5.9 million euros for 2011 and 2012, respectively, for a total of 7.1 million euros. AC ¶¶ 9, 16; Share Purchase Agreement at 2, attached to 10/25/11 8-K [43-3]; 11/6/13 8-K [43-29] at 3.

In October 2013, InnerWorkings removed Delaune as President of Productions Graphics. AC ¶ 21. Thereafter, InnerWorkings informed the market

that the Company had investigated Delaune's conduct relating to certain transactions affecting earn-out payments under the Share Purchase Agreement. 2/18/14 8-K [43-29] at 2. InnerWorkings revealed that, based on the results of the review, "the Company concluded it was the victim of a fraud perpetrated by [Delaune]" and that "[Delaune] artificially inflated results to meet earn-out targets and induce the Company to make earn-out payments relating to the Productions Graphics acquisition." 2/18/14 8-K [43-29] at 2. To reverse the revenue recognized in connection with Delaune's suspect transactions in 2011 and 2012, the Company issued restated financials, according to the Amended Complaint, on April 21, 2014, *see* AC ¶ 160—although the correct date apparently is March 18, 2014, *see* 3/18/14 10-K [43-30] at 3. InnerWorkings has filed a criminal complaint in France "seeking to redress the harm caused by [Delaune's] conduct." 3/18/14 10-K [43-30] at 53. Delaune, as well as Productions Graphics' Finance Director Jean Philippe Calzolari, have acknowledged their role in the fraud but also have implicated Belcher and InnerWorkings' CFO Joseph Busky as being co-participants. AC ¶¶ 132-34, 139-48, 154-58.

### D.     Stock Price Drop

After the market closed on November 6, 2013, and following the removal of Delaune and lagging inside sales growth, InnerWorkings announced lower profits than expected that quarter and slashed its revenue guidance for 2013. AC ¶¶ 232-32. The market responded the next day: InnerWorkings' stock price fell 40.57 percent in a day marked by heavy trading volume. AC ¶ 234.

## III.  Analysis

### A.  Counts I and II: Section 10(b) and Rule 10b-5

In Counts I and II, Plaintiff alleges that Defendants violated Section 10(b) and Rule 10b-5(a) to (c) through misrepresentations made in SEC filings, earnings calls and investor conferences from February 15, 2012 to August 8, 2013.  Counts I and II rise and fall together, *see* [43] at 37-38, so the parties addressed them together and so will this Court.

Under Section 10(b) and Rule 10b-5, Plaintiff can obtain damages if he can prove: (1) Defendants made a false or misleading statement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which Plaintiff justifiably relied; and (6) that the false statement proximately caused Plaintiff damages.  *Tellabs I*, 437 F.3d at 595; *see also Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Before addressing these substantive elements of Plaintiff's claims, however, this Court must first resolve two preliminary matters raised by Defendants. Defendants argue that the Amended Complaint cannot get off the ground because Plaintiff did not plead his claims with the particularity required by the PSLRA. Defendants also dispute the scope of the putative class period, arguing that Plymouth County Retirement System, the designated Lead Plaintiff, lacks standing to contest statements made after February 5, 2012, when Plaintiff last purchased InnerWorkings securities.

First, under the PSLRA, Plaintiff is required to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). While Plaintiff perhaps could have been more artful at times, the Amended Complaint is not so vague or confusing as to warrant dismissal. In the Amended Complaint, Plaintiff sets forth block quotes that are followed by one or more paragraphs that are broken-up by subject matter and that identify the relevant portions of the block quote, often through quoting snippets. *E.g.*, AC ¶ 194 (block quote from 11/8/12 earnings call), ¶¶ 195-96 (two paragraphs broken up by subject matter and quoting snippets from the block quote). In the paragraphs following the block quote (AC ¶¶ 195-96 in this example), Plaintiff explains, with cross-citations to the factual allegations made earlier in the Amended Complaint, why the snippets are false or misleading. This Court can follow that organization. So can other Courts, indeed, Defendants themselves cite a case crediting the organization employed here. [43] at 8 (citing *Conlee v. WMS Industries, Inc.* ("*Conlee I*"), No. 11-3503, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012)). Furthering this point, the Amended Complaint is better organized than other complaints that have been deemed adequate. For example, the complaint in *Davis v. SPSS, Inc.* ("*Davis I*"), 385 F. Supp. 2d 697, 708-09 (N.D. Ill. 2005), unlike here, lumped statements from press releases and SEC filings together and then provided "a series of reasons why the statements as a whole [were] misleading." *See also Garden City Employees' Retirement System v. Anixter International, Inc.*

("*Garden City I*"), No. 09-5641, 2011 WL 1303387, at *21 & n.12 (N.D. Ill. March 31, 2011). That was not done here.

Second, Defendants argue that Plaintiff lacks standing to challenge statements made after February 5, 2012, when designated Lead Plaintiff Plymouth County Retirement System, last bought InnerWorkings stock. Certification of Plymouth County Retirement System [15-2]. Based on the fraud-on-the-market theory, which Plaintiff relies upon here, AC ¶ 250, the Seventh Circuit has held that shareholders lack standing to bring a Rule 10b-5 claim based on allegedly false or misleading statements or omissions made by corporate defendants after the shareholders purchased their securities. *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 n.4, 1420 (7th Cir. 1992).

Plaintiff, acknowledging *Roots Partnership*, responds, and this Court agrees, that the Amended Complaint cures the standing defect by naming State-Boston Retirement System as an "Additional Plaintiff." AC ¶ 29. State-Boston Retirement System purchased InnerWorkings stock later in the putative class period, on September 26, 2013, than Plymouth County Retirement System. Certification of State-Boston Retirement System [38-2]. Lead plaintiffs can cure standing deficiencies by adding an additional plaintiff who purchased securities later in the putative class period. *See, e.g., Ong v. Sears, Roebuck & Co.* ("*Ong I*"), 388 F. Supp. 2d 871, 890-92 (N.D. Ill. 2004) (Pallmeyer, J.) (finding standing problems); *Ong v. Sears, Roebuck & Co.* ("*Ong II*"), No. 03-4142, 2005 WL 2284285, at *24 (N.D. Ill. Sept. 14, 2005) (Pallmeyer, J.) (standing problems from *Ong I* were cured through

an additional plaintiff); *Davis I*, 385 F. Supp. 2d at 705-07 (finding standing problems); *Davis v. SPSS, Inc.* ("*Davis II*"), 431 F. Supp. 2d 823, 825, 833-34 (N.D. Ill. 2006) (Coar, J.) (standing problems from *Davis I* were cured through an additional plaintiff). In fact, Defendants rely on *Davis I* to challenge Plaintiff's standing yet omit the subsequent discussion from *Davis II*.

Defendants also cite Local Rule 83.16(b), but that Rule is unavailing here. Local Rule 83.16(b) requires the attorneys who represent State-Boston Retirement System to have made an appearance. They have. *See* [3], [4], [6], [22]. This Court, moreover, reviewed the docket in *Davis v. SPSS, Inc.*, Case No. 04-3427, where adding another plaintiff cured standing problems, and observes that no attorney made a separate appearance for the additional plaintiff named in that case. This case thus is analogous to *Davis*.

Finally, even if there was a technical failure to add State-Boston Retirement System as an additional plaintiff, this Court would have given Plaintiff leave to amend only to correct that deficiency at this initial stage in the proceedings. Fed. R. Civ. P. 15(a)(2); *see also In re Guidant Corp. Securities Litigation*, 536 F. Supp. 2d 913, 925-26 (S.D. Ind. 2008), *affirmed*, 583 F.3d 995 (7th Cir. 2009); *Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04-1107, 2005 WL 61480, at *7-8 (N.D. Ill. Jan. 10, 2005). For these reasons, naming State-Boston Retirement System as an "Additional Plaintiff" enables Plaintiff to challenge statements and omissions made by InnerWorkings after February 15, 2012.

Having resolved Defendants' two preliminary matters in Plaintiff's favor, this Court now turns to the substantive elements of Plaintiff's securities fraud claim under Section 10(b) and Rule 10b-5. Plaintiff alleges that Defendants made five categories of false or misleading statements or omissions. They are Defendants' statements and omissions about: (1) the inside sales group; (2) Productions Graphics; (3) the internationalization of PPM4; (4) the enterprise client retention rate; and (5) InnerWorkings' putative class period financials. In Subsections 1 to 5 below, this Court addresses each category in turn and concludes that, when Plaintiff's allegations are viewed individually and collectively, only two are viable.

### 1. Inside Sales Group

In response to Defendants' motion, Plaintiff distills his 110-page, 281-paragraph Amended Complaint into six allegations that Defendants made false or misleading statements or omissions about inside sales. In doing so, Plaintiff chose not to respond fully to Defendants, who for their part, responded to every allegedly false or misleading statement about inside sales in their moving papers and summary table [43-2]. Based on Plaintiff's election, this Court declines to address the abandoned statements expressly, yet notes its agreement with Defendants' analysis, and further notes that its present analysis would extend to the abandoned statements too. *See McCready v. Title Services of Illinois, Inc.*, No. 06-6280, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008) (citing Seventh Circuit law to discuss principles of waiver and abandonment). The six statements about inside sales that remain are:

1. During the May 3, 2012 earnings call, Belcher said that InnerWorkings' inside sales representatives went through "very extensive training programs." AC ¶ 183.

2. During the August 10, 2012 earnings call, Belcher said that InnerWorkings' hard work in recruiting and training inside sales representatives "is being rewarded with sharply improving sales and productivity measures." AC ¶ 187.

3. During the February 13, 2013 earnings call, Belcher said that revenue from inside sales more than doubled in 2012, and that InnerWorkings expected revenue from inside sales "to more than double again this year becoming the equivalent of a top five customer for us in 2013." AC ¶ 197; *see also* AC ¶ 202 (similar statement from Belcher during InnerWorkings' annual "Investor Day" nine days later, on February 22, 2013).

4. During a March 11, 2013 investor conference, Belcher said that InnerWorkings had developed an "Internet lead generation solution … that allows us to prospect in an extremely aggressive and very efficient manner." AC ¶ 206.

5. During the May 10, 2013 earnings call, Belcher said that InnerWorkings "continue[s] to develop and improve upon our key performance metrics," and that the Company believed that the inside sales "is going to be … large and successful." AC ¶ 219.

6. During the August 8, 2013 earnings call, Belcher noted that, despite the lower than expected revenue from inside sales group and internal reorganization, InnerWorkings remained "very confident about the role this group will play in the long term growth of our business," and, going forward, the inside sales group will be "as switched on as any part of our business is right now." AC ¶ 225.

For every statement, Defendants argue that one or more of the first three elements of the securities fraud test is not met. This Court analyzes each statement in turn and concludes that dismissal is warranted.

### a)      False or Misleading Statement or Omission

Under the PSLRA, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15

U.S.C. § 78u-4(b)(1). Claiming that a particular statement was untrue is not enough. Plaintiff must explain, with particularity, the factual basis for his assertion that the statement was untrue. *Garden City II*, 2012 WL 1068761, at *4 (collecting cases); *Garden City I*, 2011 WL 1303387, at *20 (collecting cases). The relevant question is whether the facts alleged are "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I*, 437 F.3d at 595 (internal quotations omitted). These facts must show that the statements Defendants made were false when made and not incorrect in retrospect. *Higginbotham v. Baxter International Inc.*, 495 F.3d 753, 759-60 (7th Cir. 2007); *Garden City I*, 2011 WL 1303387, at *20.

Here, to substantiate that Belcher's six statements about inside sales were false or misleading, Plaintiff relies exclusively on eight confidential witnesses. This Court refers to the confidential witnesses as "CW1" to "CW8." Plaintiff generally argues that the confidential witnesses show that Defendants knew that InnerWorkings was hiring inexperienced, unproductive sales personnel, and that InnerWorkings knew that the inside sales group and its sales representatives were not meeting sales targets. *See* AC ¶¶ 184, 188, 198, 208, 220, 226. This Court first summarizes the allegations from CW1 to CW8; then analyzes Seventh Circuit law about confidential witnesses; and, having parsed the witness allegations and analyzed the relevant law, last concludes that CW1 to CW8 do not show that Statements 1 to 6 are false or misleading.

CW1, a Business Development Consultant from October 2011 to August 2013, alleged that he often saw internal reports that projected sales targets greater than what the inside sales group was able to deliver, with the group being "nowhere near there." AC ¶ 72. These reports originated from two Vice Presidents of Sales, Lindsey Campbell and Mark Holmes, who replaced their predecessor Brian Simms in July 2013. AC ¶¶ 72, 74. CW1 also referenced emails from Campbell and Holmes "during the last couple of months of [CW1's] tenure," that is, July and August 2013, showing that the inside sales group was missing sales targets. AC ¶ 72. CW1—as well as CW2 and CW5—further observed that inside sales representatives often were hired straight from college and lacked sales experience. AC ¶¶ 73, 75, 83.

From December 2010 to August 2013, CW2 was first an Account Manager and then a Sales Manager at InnerWorkings. AC ¶ 74. As a Sales Manager, CW2 reported to the Vice President of Sales. AC ¶ 74. Plaintiff did not expressly allege that CW2 was a member of the inside sales group. *See* AC ¶¶ 72-79.

CW2 alleged that the inside sales group in "no way" met InnerWorkings' goals for 2012. AC ¶ 74. CW2 added that, for an unstated timeframe, no more than 15 percent of middle market account executives met their internal targets, and that those targets were unrealistic. AC ¶ 76. In support, CW2 described an internal InnerWorkings sales report for Q3 2013 that showed the Company's sales targets for each month during July to September 2013; and actual sales for July 2013 and part of August 2013. AC ¶ 77. The report showed: (1) approximately $1 million in

sales for July 2013; (2) approximately $900,000 in sales for part of August 2013; and (3) an estimate of approximately $2.9 million in sales for the remainder of the quarter, meaning the remainder of August 2013 and all of September 2013. AC ¶ 77. The report also showed that the average ratio of actual bookings to target bookings across the seven inside sales teams in July 2013 was 47 percent. AC ¶ 77. According to CW2, Senior Vice President of Business Technology Rob Burkart, who reported to Belcher, received an email attaching this report. AC ¶ 78. When Burkart received the email is not pled. *See* AC ¶ 78.

CW2 also recalled seeing a graph "during his tenure" that showed that the inside sales group achieved $4 million in sales in 2012. AC ¶ 77. Plaintiff contrasts that number with his inference that InnerWorkings had inside sales of $19.9 million. AC ¶ 79. Specifically, InnerWorkings' Form 10-K for 2012 reported $199,424,718 in middle market revenue; and, according to a Barrington Research report, the inside sales group generated approximately 10 percent of middle market revenues. AC ¶ 79. Ten percent of $199,424,718 is approximately $19.9 million.

Neither CW3 nor CW4 add much relevant to Plaintiff's inside sales claim. CW3, a Financial Account Manager from August 2012 to March 2014, stated that Belcher and Busky could access the PPM4 reports generated by inside sales. AC ¶ 80. CW4, a Brand Delivery Associate from May 2012 to August 2013, made no allegations about the inside sales group's performance. AC ¶ 81.

CW5, a Sales Manager from 2012 to January 2014 who supervised an inside sales team and reported to the Vice President of Sales, alleged that, at an

undisclosed time, he spoke with Belcher about "growing pains" in the group, managerial issues and strategy. AC ¶ 82. Plaintiff did not elaborate on the nature of CW5's "growing pains." *See* AC ¶ 82. CW5 alleged that inside sales representatives were not making much money because there was an extended period of time when sales were "bad." AC ¶ 83. CW5 believed that Belcher and Busky had access to "information" about SMB quotes and sales that "were regularly discussed via email." AC ¶ 83.

CW6, a Business Development Specialist from May 2012 to January 2014, alleged that Simms was terminated in July 2013 because "SMB" had been missing their sales goals by "millions" every quarter. AC ¶¶ 84-85. CW6 estimated that only 5 percent of SMB sales representatives met their quotas for any given month. AC ¶ 85. CW6 reported to sales managers who reported to the Vice President of Sales. AC ¶ 85.

CW7, a Sales Executive and Lead Generation Manager from September 2011 to December 2012, recalled that "SMB was consistently not meeting revenue goals." AC ¶¶ 87, 91. CW7 further recalled that "by the end of summer 2012, SMB was only at 20 percent of sales goals for the year, and only at 40 percent by the end of that year." AC ¶ 91.

CW8 was a Senior Sales Manager from January 2013 until his resignation in August 2013. AC ¶ 92. CW8 alleged that he resigned because "the writing was on the wall," and InnerWorkings had given up on its investment in the "SMB division." AC ¶ 92. CW8 alleged that it became apparent by June 2013 that the Company had

stopped investing in "SMB," as CW8 recalled receiving pushback when he asked for more personnel.  AC ¶ 92.

Defendants argue that, as a categorical matter, these allegations are subject to a "heavy discount" because CW1 to CW8 are not named.  Not so.  There is no categorical discount of confidential witness allegations where, as here, Plaintiff has described the witnesses with enough detail that this Court can determine that the confidential witnesses have a foundation for their allegations.  *See City of Sterling Heights General Employees' Retirement System v. Hospira, Inc.*, No. 11-8332, 2013 WL 566805, at *17 (N.D. Ill. Feb. 13, 2013) (reaching the same conclusion); *see also Ross v. Career Education Corp.*, No. 12-276, 2012 WL 5363431, at *4 (N.D. Ill. Oct. 30, 2012); *Davis II*, 431 F. Supp. 2d at 828, 831.  In 2006, the Seventh Circuit noted that when plaintiffs support their allegations with confidential sources, they "must … describe their sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Tellabs I*, 437 F.3d at 596.  That decision was vacated by the Supreme Court's decision in *Tellabs II*, and, following *Tellabs II*, the Seventh Circuit, in 2007, reasoned that the *Tellabs II* "competing inference" analysis required Courts to "discount allegations that the complaint attributes to … confidential witnesses." *Higginbotham*, 495 F.3d at 757.

The next year, however, the Seventh Circuit clarified that a particularly troubling use of the confidential sources prompted the holding in *Higginbotham*. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs III*"), 513 F.3d 702, 711-12 (7th

Cir. 2008). In *Higginbotham*, as explained by *Tellabs III*, 513 F.3d at 711-12, the plaintiffs described their confidential witnesses "merely as three ex-employees of Baxter and two consultants," but gave no further detail, such as their job descriptions.

Consistent with *Higginbotham* and *Tellabs III*, six years later in *City of Livonia Employees' Retirement System & Local 295 / Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013), the Seventh Circuit discounted a reference to internal emails. The reference implied that someone inside the corporate defendant was aiding plaintiffs, but no person was identified and described in the initial complaint, so neither the district court nor the Seventh Circuit could evaluate those allegations. *Boeing*, 711 F.3d at 759. While those allegations could not survive a motion to dismiss, when the complaint was amended to describe the confidential witness, including giving his job title and describing the information the witness had access to, the district court denied the motion to dismiss. *Id.* at 759-60. That result stood until the district court learned that the confidential witness' allegations had been falsified. *Id.* at 760-61. In reviewing the district court's decision, the Seventh Circuit did not suggest that the district court had erred at any stage. *See id.* at 759-61.

In light of this law, this Court declines to discount *categorically* the allegations from CW1 to CW8. Yet, where particular allegations lack a sufficient foundation, they will be discounted on an allegation-by-allegation basis. *See Hospira*, 2013 WL 566805, at *17 (adopting the same approach). Having parsed

each confidential witness' allegations and found that they are not subject to a categorical discount, this Court now turns to the challenged statements:

**Statement 1:** Beginning with Statement 1 (that inside sales personnel went through "very extensive training programs"), Plaintiff makes no allegation that InnerWorkings' training programs were not in fact extensive. Plaintiff nowhere alleges that inside sales representatives did not undergo extensive training after they were hired. To the contrary, Plaintiff's own confidential witness, CW5, credited InnerWorkings' training program for its length—five to six weeks long. AC ¶ 83. Thus Plaintiff has offered no specific information known to Belcher and contradicting Statement 1, so this Court has no basis to conclude that it was false or misleading. *See Garden City II*, 2012 WL 1068761, at *5-6, 8 (reaching the same conclusion for certain statements at issue there).

**Statements 2 to 5:** Statements 2 to 5 (which are Belcher's optimistic statements from August 2012 to May 2013 about the direction of the inside sales group's performance) are not false or misleading for multiple, independent reasons.

First, Plaintiff relies on circumstantial evidence, namely, the confidential witnesses allegations that inside sales hired inexperienced sale personnel "right out of college" and that the group was not meeting sales goals, to infer that Statements 2 to 5 are false. *See* AC ¶¶ 188, 198, 208, 220. Perhaps in hindsight there were more productive salesmen than recent college graduates, but it does not follow that Statements 2 to 5 were false or misleading when made. Inside sales could have been growing and improving in spite of not having the best sales personnel.

To Plaintiff's next point, CW2 was the only confidential witness who offered any information about the inside sales group's ability to meet internal sales targets during August 2012 to May 2013—the relevant timeframe for Statements 2 to 5. AC ¶ 74. CW2 generally alleged that the group in "no way" met InnerWorkings' goals for 2012. AC ¶ 74. Plaintiff did not plead sufficient detail, however, to lay the foundation that CW2 was a member of the inside sales group or that he knew the information alleged. There is simply no support for CW2's broad allegation. Absent that support, this Court finds that Statements 2 to 5 do not meet the exacting pleadings requirements of the PSLRA.

Beyond CW2, Plaintiff argues that CW6 and CW7 also provided information about unmet sales goals during the relevant timeframe. CW6 alleged that "SMB" had been missing their sales goals by "millions of dollars each quarter," and that "SMB" sales representatives had not met their sales quotas for any given month. AC ¶¶ 84-85. CW7 alleged that "SMB" failed to meet its sales goals in 2012. AC ¶ 91.

Defendants respond by distinguishing the performance of "SMB" with the performance of inside sales. Defendants, citing to AC ¶ 79, argue that inside sales generated just 10 percent of SMB's revenue during 2012 and 2013, so CW6 and CW7's allegations that "SMB" fell short of sales targets does not mean that each of its segments, such as inside sales, also fell short. This Court agrees. Poor performance by a department does not necessarily translate to poor performance by each of its segments. Another Court in this District echoed this same principle,

finding that evidence of a worsening economic climate in Europe in 2008 did not render false or misleading a company's statement that it had a "solid backlog of orders" in that region. *Garden City I*, 2011 WL 1303387, at *21.

Plaintiff responds that it was "entirely plausible" that CW6 and CW7 meant inside sales when they said "SMB." Plaintiff explains that employees at InnerWorkings, such as CW5, used the acronym "SMB" *also* to refer to inside sales. AC ¶ 82. Plaintiff continues that, in a February 2013 call, Belcher said that the inside sales group had been placed on the sixth floor of a new facility, and that confidential witnesses, including CW6, referred to the "sixth floor" as "SMB." AC ¶¶ 68, 81, 86. This chain of inferences spanning multiple people may or may not be plausible, but it remains insufficient at this stage of the proceedings.

Indeed, Plaintiff's interpretation of "SMB" is unlikely based upon the current allegations. Plaintiff did not plead that CW6 and CW7 were members of the inside sales group and, in fact, the opposite may be true where the relevant witnesses were not members of the group they were discussing. CW6's responsibilities did include "telephonically developing and maintaining both small and mid-level customers," AC ¶ 84, and inside sales made cold-calls to prospective clients, AC ¶¶ 6, 61, but this Court cannot infer from CW6's telephonic activity alone that he was a member of the inside sales group. Plaintiff did not plead that only SMB members in the inside sales group conducted telephonic sales calls. The evidence that CW7 was not a member of inside sales is even stronger. CW7 was responsible for generating new leads for large accounts, AC ¶ 87, whereas inside sales focused on small to mid-sized

customers, AC ¶¶ 6, 62. CW7 also did not report to the Vice President of Sales who ran the inside sales group. AC ¶¶ 68, 87.

There are further obstacles in the allegations preventing this Court from simply inferring that CW6 and CW7 used the word "SMB" to mean inside sales. Neither one gave any basis for their recollection that "SMB" was not meeting sales goals. *See* AC ¶¶ 85, 91. This Court reviewed the testimony about the "sixth floor," AC ¶¶ 68, 81, 86, and finds no strong basis to draw Plaintiff's inference. Belcher did not say that the sixth floor was exclusive to inside sales, so "sixth floor" and "inside sales" are not necessarily coterminous. AC ¶ 68. Even if coterminous, inside sales is part of SMB, so CW6 is correct to say that "SMB had moved to the 6th floor in February 2013," even if he meant inside sales specifically. AC ¶ 86. Calling "inside sales" "SMB," however, does not prove the converse—that references to "SMB" necessarily mean "inside sales."

Even if CW6 and CW7 referenced inside sales, their allegations that "SMB" was performing poorly are insufficient to meet the PSLRA's exacting pleadings requirements. CW6 and CW7 failed to supply the detail this Court requires under the PSLRA to conclude that their recollections are based on personal knowledge. Neither specified when SMB was "consistently" below sales goals or when SMB sales goals were doubling. *See* AC ¶¶ 85, 91. And neither gave a basis, such as pointing to a particular document, for those allegations. *See* AC ¶¶ 85, 91.

At bottom, the PSLRA requires more than what CW6 and CW7 (as well as CW2) have supplied. For example, the confidential witnesses in *In re Zumiez Inc.*

*Securities Litigation*, No. 07-1980, 2009 WL 901934, at *8-9 (W.D. Wash. March 30, 2009), made broad allegations about the corporate defendants' performance without laying the required foundation to show they were positioned to make those assessments. The statements in that case mirror the ones here, such as that the company: (1) was "expanding too rapidly and … everyone knew it," and (2) "did not have enough experienced employees to expand as fast as [it] did." *Id.* at *8.

Second, even assuming that InnerWorkings missed internal sales targets, this fact does not, without more, render Belcher's public statements false. Internal sales targets may be designed as incentives as much as predictions, *In re Smith & Wesson Holding Corp. Securities Litigation*, 669 F.3d 68, 75 (1st Cir. 2012), so unmet sales targets do not imply that the company's performance was actually poor. Even if poor, unmet sales targets do not deny that sales were improving. Plaintiff overlooks this distinction. Statements 2 and 3—that unidentified "sales and productivity metrics" were "sharply improving," and that inside sales revenue was expected to "double"—regard only the directional performance of sales (improving or declining) and not their absolute level (good or bad). Those are far different claims. *See In re Smith & Wesson*, 669 F.3d at 75; *Garden City I*, 2011 WL 1303387, at *24 n.21.

Plaintiff relies most heavily on *In re St. Jude Medical, Inc. Securities Litigation*, 836 F. Supp. 2d 878 (D. Minn. 2011), where the Court denied a motion to dismiss in a securities fraud action, but that case is distinguishable. Unlike here, there was direct evidence in *St. Jude Medical* contradicting St. Jude Medical's rosy

financial guidance to investors. *Id.* at 884, 898-99. In particular, internal financial forecasts and daily reports that were circulated among the company's management showed that sales of St. Jude Medical's principal product (CRM devices, which accounted for 60 percent of sales) were falling and, more generally, market conditions were weakening. *Id.* at 898-99, 903. This stark contrast between public guidance and internal knowledge is not present here.

**Statement 6:** Turning last to Statement 6, in the August 8, 2013 earnings call, Belcher said that, despite the lower than expected revenue from inside sales, he was "very confident about the role this group will play in the long term growth of our business." AC ¶ 225. Belcher added that the initiative, going forward, will be "as switched on as any part of our business is right now." AC ¶ 225. Plaintiff argues that these statements are false, and further adds that Belcher omitted two material pieces of information from the call: (1) Defendants had terminated Vice President of Sales Brian Simms in July 2013; and (2) Defendants were planning to terminate 40 inside sales employees, which Defendants did in fact do on or around August 30, 2013. AC ¶¶ 72, 75, 81, 92, 226.

Addressing first the alleged misstatements, in the context of the entire August 8, 2013 earnings call, neither one is false or misleading within the meaning of the PSLRA. Belcher acknowledged the inside sales group's disappointing performance on the call, but he reaffirmed InnerWorkings' confidence in the group's long-term trajectory, including by outlining a strategy to turnaround the group's performance. On the earnings call, the public specifically learned that: (1) inside

sales had not met InnerWorkings' "expectations;" (2) InnerWorkings had "recently reorganized the management of the group;" (3) InnerWorkings was looking to align with a channel partner to enhance the Company's client acquisition capability; and (4) InnerWorkings had "some bigger picture strategic ideas for the group … that will be coming online here later in the year." 8/8/13 Earnings Call Tr. [43-26] at 1, 4, 7. Analysts reporting on the earnings call took away that InnerWorkings had made a management change, which was Simms' termination, and inside sales had been performing below expectations. *See* AC ¶¶ 228-30.

Turning now to the purported omissions, as stated above, material omissions can be actionable. *Tellabs I*, 437 F.3d at 595. The first one, that Belcher omitted that InnerWorkings had terminated Simms, was in fact addressed on the August 8, 2013 earnings call; Belcher said that InnerWorkings had "recently reorganized the management of the group." AC ¶ 225. The omission of Simms' name does not render the statement materially false or misleading.

The second omission, Belcher not saying that the Company was going to terminate 40 inside sales employees, also fails. Beyond general allegations that inside sales was not meeting sales goals, Plaintiff made no showing that Belcher, or anyone else at InnerWorkings for that matter, knew that layoffs were forthcoming on August 8, 2013. Nor does Plaintiff suggest when InnerWorkings decided to conduct layoffs—which may very well have occurred after August 8, 2013. Plaintiff's strongest allegations perhaps come from CW8. CW8, a member of the inside sales group, alleged that "it was apparent by at least June 2013 that the

Company had stopped investing in SMB." AC ¶ 92. CW8 recalled "receiving pushback when he asked for certain resources like more personnel." AC ¶ 92. Receiving pushback for wanting more personnel is consistent with an underperforming group, but that does not substantiate the far broader claim that InnerWorkings had "stopped investing" in the inside sales group. This Court parsed the remaining allegations about the layoffs, *see* AC ¶¶ 72, 75, 81, 226, and finds nothing else supporting that Belcher omitted material knowledge known to him. Based on this factual record, this Court finds that, whether framed as an omission or Belcher's lack of scienter, Plaintiff has not satisfied the PSLRA's exacting pleading requirements.

Even had Belcher known that layoffs were possible, and there are no allegations suggesting that he did, the Seventh Circuit has found this failure of candor to be inactionable under circumstances more compelling than here. In *Boeing*, 711 F.3d at 757-59, the Seventh Circuit, based on the principle that there is a "difference … between a duty of truthfulness and a duty of candor, or between a lie and reticence," affirmed dismissal of a securities fraud action, finding that Boeing's failure to disclose the risk that the first flight of the new 787-8 Dreamliner, an important developmental milestone for an aircraft, may be delayed was not fraudulent under the PSLRA. The Seventh Circuit reached this decision even though, worse than here, Boeing executives made public predictions that the Dreamliner would fly in June 2009 despite knowing that the Dreamliner had failed a recent, May 17, 2009 internal test. *Id.* at 757-58. On June 1, 2009, Boeing's CEO

stated publicly that he thought the Dreamliner would fly in June 2009. *Id.* at 757. Later that month and without reservation, the head of Boeing's commercial aircraft division told *Bloomberg* that the Dreamliner "definitely will fly" this month. *Id.* Shortly thereafter, on June 23, 2009, Boeing announced an indefinite postponement of the first flight because of an anomaly revealed by internal tests. *Id.* at 757-58.

Instructive here, the Seventh Circuit did not find the inference of scienter cogent in *Boeing*. Indeed, that inference was less plausible than the innocent explanation: Boeing was reluctant to tell the world "we have a problem and maybe it will cause us to delay the First Flight and maybe not, but we're working on the problem and we hope we can fix it in time to prevent any significant delay, but we can't be sure, so stay tuned." *Id.* at 758-59. The Seventh Circuit further found that Boeing lacked any incentive to delay the announcement of the indefinite postponement. *Id.* at 758. Had Boeing known on May 17 (the date of the internal test) that the first flight would necessarily be postponed, then Boeing risked undermining its credibility with customers and exposing itself to a securities fraud lawsuit by delaying that postponement five weeks, until June 23. *Id.* Conversely, Boeing had nothing to gain financially during those five weeks. *Id.*

Here, as in *Boeing*, Belcher recognized during the August 8, 2013 earnings call that the inside sales group was facing challenges. *See* AC ¶ 225; 8/8/13 Earnings Call Tr. [43-26] at 1, 4, 7. Yet, even if Belcher suspected that layoffs would be forthcoming as a result of those challenges, *Boeing* shows that Belcher had no obligation to be candid about the worst case scenario while InnerWorkings was

trying to avoid that outcome. Belcher, to be sure, did have an obligation not to speak falsely, *see Boeing*, 711 F.3d at 759, and *Hospira*, 2013 WL 566805, at *17, and he did not. Whereas Belcher was painting a mixed picture of the inside sales group's performance three weeks before the layoffs, the head of Boeing's commercial aircraft division could not have been more optimistic by comparison, saying less than two weeks before the Dreamliner's first flight was indefinitely postponed that the Dreamliner "definitely will fly."

Moreover, Plaintiff has not shown that Belcher had any incentive to omit information about layoffs on the August 8, 2013 earnings call. If the layoffs were coming, then, as in *Boeing*, Plaintiff has not shown what Belcher had to gain from delaying the inevitable. Belcher did make stocks sales in the interim—two sales on August 16 and 19, 2013 with net proceeds of $146,412.80, AC ¶ 236—but those sales were made automatically pursuant to Belcher's Rule 10b5-1 trading plan that he had entered into months earlier. SEC Form 4 [43-31] at 2 n.1; *Garden City II*, 2012 WL 1068761, at *13. Plaintiff also has not shown that the sales were profitable or otherwise part of a scheme to defraud.

For these reasons, Statements 1 to 6 are not false or misleading statements or omissions. Thus they are not actionable.

### b) Material

Separate from whether a statement is false or misleading, statements also are not actionable under the PSLRA unless they are material. Statements are material if they affect an investor's perception of the security, "significantly altering

the total mix of information." *Searls v. Glasser*, 64 F.3d 1061, 1065-66 (7th Cir. 1995); *see also Tellabs I*, 437 F.3d at 596. Each statement must be viewed in context. *Tellabs I*, 437 F.3d at 597. As a general matter, one consequence of this construction of "material" is that predictions and forecasts which are not of the type subject to objective verification are "rarely" actionable under the PSLRA. *Searls*, 64 F.3d at 1066.

One kind of immaterial statement is "puffery"—"loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games, Inc. Securities Litigation*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004); *see also Tellabs I*, 437 F.3d at 596; *Conlee II*, 2013 WL 1767648, at *6; *Anderson v. Abbott Laboratories*, 140 F. Supp. 2d 894, 902, 905, 908 (N.D. Ill. 2001), *affirmed*, 269 F.3d 806 (7th Cir. 2001). Analysts rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. *In re Midway Games*, 332 F. Supp. 2d at 1165. Puffery can take multiple forms, and, from reviewing Seventh Circuit law, *e.g.*, *Tellabs I*, 437 F.3d at 596-98, and *Searls*, 64 F.3d at 1066-67, this Court has discerned four categories of puffery relevant here: (1) indefinite predictions of growth; (2) optimistic rhetoric and hype; (3) subjective statements; and (4) vague statements.

In *Searls*, 64 F.3d at 1066-67, the Seventh Circuit found that two statements were puffery. In the first, GATX Corporation's ("GATX") CEO James Glasser said

that the GATX was "recession-resistant" in the company's 1990 annual report, and repeated that message in later communications to shareholders. *Id.* at 1064, 1066. The following year, however, GATX's net income fell below expectations. *Id.* at 1065. The Seventh Circuit found that the phrase "recession-resistant" was "simply too vague to constitute a material statement of fact." *Id.* at 1066. The statement was "optimistic rhetoric" used to champion GATX but "devoid of any substantive information." *Id.*

As for the second statement, Glasser twice assured investors that GATX would maintain a "high" level of "disposition gains," which accrued from selling used aircrafts and railcars at a price in excess of the equipment's accounting value. *Id.* at 1064, 1066-67. Disposition gains played "significant roles" in GATX's success. *Id.* at 1064. Despite investors having a vested interest in GATX's disposition gains, Glasser's "high" statements remained puffery according to the Seventh Circuit. *See id.* at 1067. It was nothing more than an indefinite, "loose prediction" that was of no help to investors. *Id.* No investor could determine, for example, if disposition gains would be "high" relative to the previous year or previous few years. *Id.* Nor could any investor determine how far into the future "high" disposition gains would last. *Id.* More was required. *See id.*

Indeed, the Seventh Circuit contrasted Glasser's statement with the even more definite comments from other cases that nonetheless were found to be puffery. *Id.* (collecting cases). For example, the Seventh Circuit cited *Raab v. General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993), where the Fourth Circuit found

that a projection of annual growth in the range of "10% to 30% over the next several years" was too indefinite to support a claim for securities fraud. That statement in *Raab*, according to the Seventh Circuit, was not at all definite: the range of rates was broad and the period over which the growth was to occur was left open. *Searls*, 64 F.3d at 1067.

The Court's decision in *Anderson* also is informative. In that case, Abbott's annual report said the company was a leader and had grown in certain market segments, potentially suggesting future performance. 140 F. Supp. 2d at 905. The Court described those vague statements about industry leadership and unquantified growth as "classic puffery." *Id.* A public statement from Abbott's CEO Miles White also was not actionable. White said Abbott had a goal of reaching a "higher level of performance," and that the company was "building on the strength established over the decades." *Id.* at 908 (internal brackets omitted). That, according to the Court, was "incredibly vague puffery," and "even that stretches the words' meanings." *Id.* Many other cases also show that loosely optimistic statements about a company's present or future performance are puffery, *e.g.*, *In re Midway Games*, 332 F. Supp. 2d at 1164 (collecting examples), but this Court can end its discussion of case law here.

These cases, and others, show that Statements 4 to 6 are immaterial puffery. Consider the following table which matches each statement with their types of puffery. Plaintiff, for his part, omits discussing these statements in the puffery section of his motion papers.

| InnerWorkings Statement | Types of Puffery |
|---|---|
| **Statement 4.**<br><br>Belcher stated that InnerWorkings had developed an "Internet lead generation solution … that allows us to prospect in an extremely aggressive and very efficient manner." AC ¶ 206. | **Subjective and Vague Statement.**<br><br>As in *Conlee II*, 2013 WL 1767648, at *6, where the corporate defendant touted its "intense focus" and "vigilance" in executing operational improvements (all puffery), Belcher opined here on InnerWorkings' subjective efforts: its ability to prospect effectively. Belcher did not say that InnerWorkings actually would prospect effectively. Nor did Belcher give any metrics for measuring InnerWorkings' ability to prospect, so his statement also is devoid of any particular information an investor would find important. |
| **Statement 5.**<br><br>Belcher said that InnerWorkings "continue[s] to develop and improve upon our key performance metrics." AC ¶ 219. | **Subjective and Vague Statement.**<br><br>Same comments as for Statement 4. Similar statements, moreover, were found inactionable in *Hospira*, 2013 WL 566805, at *24-25, where Hospira said it was "redoubling its commitment to quality" and "raising the bar internally." |
| **Statement 5.**<br><br>Belcher believed that inside sales "is going to be … large and successful." AC ¶ 219. | **Indefinite Predictions of Growth and Optimistic Rhetoric.**<br><br>As with the growth comments in *Anderson* and the "recession-resistant" and "high" comments in *Searls*, Belcher's "large and successful" statement here is a "loose prediction" of inside sales growth. That prediction, importantly, is not tied to concrete numbers, and the prediction certainly is more vague than the immaterial puffery in *Raab* ("10% to 30% over the next several years"). *See also Hospira*, 2013 WL 566805, at *23-24 (statement that a business initiative "is really serving to transform the company" was puffery). |
| **Statement 6.**<br><br>Belcher said that InnerWorkings remained "very confident about the role this group will play in the long term growth of our business" despite lower than expected revenue. AC ¶ 225. | **Indefinite Predictions of Growth and Optimistic Rhetoric.**<br><br>This statement tracks the "recession-resistant" and "building on the strength established over the decades" comments in *Searls* and *Anderson*. In those cases, as here, the CEO expressed optimism about their Company's performance but gave no specifics. |
| **Statement 6.**<br><br>In Belcher's view, the internal sales group will be "as switched on as any part of our business is right now." AC ¶ 225. | **Optimistic Rhetoric and Subjective and Vague Statement.**<br><br>In addition to comments for Statement 4, Belcher's statement gives no details about the phrase "switched on." As with the "high" comment in *Searls*, no investor could understand precisely what Belcher meant. |

Further compelling this Court's conclusion that Statements 4 and 5 (but not Statement 6) constitute puffery, Plaintiff has not shown that the market reacted to those statements. *See* AC ¶¶ 207-08, 220-24. This is a proper consideration. *Hospira*, 2013 WL 566805, at *24; *Anderson*, 140 F. Supp. 2d at 902. Regarding Statement 5, Plaintiff did plead that InnerWorkings' stock price closed up 2.15 percent on May 10, 2013, following the earnings call that day, AC ¶ 221 n.17, but alleged that the increase was due to other factors. Plaintiff pled that analysts "concentrated on the enterprise 'wins' and an expected bump in revenues from Productions Graphic's 'seasonal' strengths in the second half of the year." AC ¶ 222; *see* also AC ¶¶ 223-24.

For these reasons, Statements 4, 5 and 6 are immaterial puffery. Thus they are not actionable for this second reason.

### c)  Scienter

Defendants' statements about inside sales are inactionable for yet another reason. For each one, the PSLRA requires that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That "required state of mind" is an intent to deceive, shown by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false. *Higginbotham*, 495 F.3d at 756. A reasonable person must be able to deem the inference of scienter cogent and "at least as compelling" as any opposing inference that could be drawn from the facts alleged. *Tellabs II*, 551 U.S. at 324. This inquiry is "inherently comparative," *see*

*Tellabs II*, 551 U.S. at 323, as this Court must weigh the competing inferences from the facts pled in the Amended Complaint.

In many ways, this Court's preceding analysis overlaps with its scienter analysis. Plaintiff, as shown above, has failed to plead that any of Belcher's statements or omissions were false, so it follows that Defendants could not have made those same statements with the state of mind required by the PSLRA. This Court, nonetheless, addresses Plaintiff's two additional arguments that Defendants acted with the required state of mind. Both regard Defendants' financial motive to mislead the public about the inside sales group's performance.

First, Plaintiff points to the allegedly odd timing of Belcher's stock sales, as Belcher made gross sales totaling $1,818,743.10 during the putative class period but made comparatively few sales at other times. AC ¶ 236. However, because "executives sell stocks all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh*, 521 F.3d at 695. While Belcher's stock sales certainly are probative of scienter, they do not get Plaintiff far enough along to survive dismissal when viewed against the entire record.

Belcher's stock sales lack enough context for this Court to draw the required, demanding inference of scienter from the pleadings. Total sales amounting to a low percentage of an insider's percentage of stock holdings undercut any inference of scienter, as Courts have found scienter lacking under those circumstances. *E.g.*, *Tellabs I*, 437 F.3d at 604 (insider sold 80,000 shares, but that was only 1 percent of

his holdings); *Garden City I*, 2011 WL 1303387, at *31 (insider sold 1,045 shares amounting to only 7.17 percent of his holdings); *In re Gildan Activewear, Inc. Securities Litigation*, 636 F. Supp. 2d 261, 270-71 (S.D.N.Y. 2009) (two insiders sold 4.9 percent and 22.5 percent of their holdings).

Also undermining any inference of scienter is the lack of evidence showing that the insider made a net profit. *Garden City II*, 2012 WL 1068761, at *14; *In re Gildan Activewear*, 636 F. Supp. 2d at 270-71. Plaintiff pled Belcher's "net proceeds" from his sales, AC ¶ 236, but net proceeds is the amount received from stock sales minus transaction costs. Net proceeds is not profits. On both issues, the Amended Complaint is silent. It may be that Belcher sold less than 25 percent of his stock holdings during the putative class period, like the one investor in *In re Gildan Activewear*. It also may be that Belcher made no net profit—or even incurred a loss—on his stock sales. That possible outcome, of course, contradicts Plaintiff's belief that Belcher was profiting on his allegedly false and misleading statements and omissions.

Though not outcome determinative, this Court adds that it gives no weight at this stage to Defendants' argument that Belcher's stock sales were not planned but rather prescheduled and automatic, having been made pursuant to a Rule 10b5-1 trading plan. Belcher entered into this trading plan on November 14, 2012, *see* SEC Form 4 [43-31] at 2 n.1, during the middle of the putative class period, and this Court finds compelling the analysis from *Freudenberg v. E*TRADE Financial Corp.*, 712 F. Supp. 2d 171, 200-01 (S.D.N.Y. 2010). The Court in *Freudenberg* explained

why a "clever insider" might disguise unlawful conduct by entering into a Rule 10b5-1 plan only after the securities fraud (and, in turn, the putative class period) has commenced. Perhaps that strategy may not "maximize illicit profits," as Defendants suggest, but it could lessen the risk of being caught—the other half of the risk-reward equation.

Setting aside Belcher's stock sales, Plaintiff's allegations are silent about whether other InnerWorkings insiders, such as Busky, sold their stocks during the putative class period. That too cuts against any strong inference of scienter, as the Courts found in *In re Gildan Activewear*, 636 F. Supp. 2d at 271-72 (collecting cases), and *Davis I*, 385 F. Supp. 2d at 715. Plaintiff names two individuals as defendants and alleges a corporate scheme to inflate InnerWorkings' stock prices, yet fails to allege that insiders other than Belcher profited. *See id.*

Second, Plaintiff infers scienter from Belcher's and Busky's compensation package. Belcher and Busky received InnerWorkings stock and options as part of their compensation, and their bonus was based in part on the Company's performance. AC ¶¶ 237-41. For both men, 40 percent of their 2012 and 2013 bonus was tied to the Company's "revenue growth." AC ¶¶ 239-40.

The Seventh Circuit, however, has considered and rejected Plaintiff's argument as "too generic" to satisfy the pleading requirements set forth by *Tellabs II*. *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012). The Seventh Circuit explained that Plaintiff's

allegation is flawed because it could be levied against "about every firm in the world." *Id.* The Court stated:

> Plaintiffs contend that we should infer scienter because … top managers had an incentive to make Zimmer [the defendant corporation] look good in order to keep their jobs, improve their bonuses, and increase the value of their stock options. This is too generic to satisfy *Tellabs*. A similar assertion could be made about every firm in the world, but the fact that managers benefit from higher stock prices does not imply that any particular manager committed fraud. Quite the contrary. Managers usually do best when a firm has long-term success.

*Zimmer Holdings*, 679 F.3d at 956; *see also Davis I*, 385 F. Supp. 2d at 714 (collecting cases, including *Chu*); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000) (rejecting motive allegations that merely illustrated "the goals of all corporate executives").

The executives in *Zimmer Holdings*, 679 F.3d at 956, also lacked the requisite scienter because the marginal bonus they would have received from committing securities fraud was not worth "putting their fortunes and careers at stake." The same is true here. It would have been a bad gamble for Belcher and Busky to risk their fortunes and careers on misrepresenting the inside sales group's performance. The Amended Complaint is replete with allegations confirming that the bulk of InnerWorkings' revenue growth derived from enterprise clients and mergers and acquisitions—and, conversely, that SMB and inside sales did not contribute much to that growth. *E.g.*, AC ¶ 50 (a February 2012 William Blair report stated that "growth continues to be driven by strength in the enterprise business (75% of total revenue)," and that enterprise growth "contributed 18

percentage points to total revenue growth"); ¶ 53 (Belcher stated in February 2013 that the "enterprise solution … represents three quarters of our business today and is also represented over the last few years the majority of our growth by far"); ¶ 61 (in a February 2012 report, Barrington Research expected SMB to contribute 2 to 4 percentage points of growth in 2013); ¶ 90 (CW7 stated that "90% of the Company's revenue was a result of mergers and acquisitions, not internal growth"). Because the inside sales group's contribution to InnerWorkings' revenue growth was small, misrepresenting the group's growth would not have contributed much to Belcher and Busky's bonus. Instead, their bonus was tied to the Company's overall "revenue growth," not just the inside sales group's growth. AC ¶¶ 3, 79, 239-40.

Weighing the inferences from these facts separately and collectively, as this Court must do, *Tellabs II*, 551 U.S. at 322-23, this Court finds that Plaintiff has not met his burden of pleading scienter. Plaintiff's inside sales claim fails for this additional reason. With multiple bases to dismiss Plaintiff's inside sales claim, this Court finds its unnecessary to address one last potential grounds: the PSLRA's safe harbor.

### 2. Productions Graphics

Plaintiff next argues that Belcher and Busky directed Christophe Delaune, the former President of Productions Graphics, to inflate Productions Graphics' perceived performance by conducting a false-invoicing scheme. Having misled the market about Productions Graphics' actual performance, Plaintiff argues that Belcher and Busky made false or misleading statements or omissions about that

performance during the putative class period. *See* AC ¶¶ 187, 189-90 (8/10/12 earnings call), ¶¶ 194, 196 (11/8/12 earnings call); ¶¶ 197, 199-200 (2/13/13 earnings call), ¶¶ 216-17 (5/7/13 conference), ¶ 219, 221-23 (5/10/13 earnings call), ¶¶ 225, 227-28 (8/8/13 earnings call). For example, on August 8, 2012, Busky said that InnerWorkings had "confidence that [Productions Graphics] are going to hit their earn-out payments." AC ¶ 187. Similar comments about the strength of Productions Graphics' performance followed. AC ¶¶ 194, 219, 225. Belcher and Busky also characterized the Company's growth in Europe as "strong." AC ¶¶ 194, 197. Unlike with the preceding statements about inside sales, Plaintiff may proceed with the challenged statements about Productions Graphics.

The dispute between the parties turns, at least at this initial stage, on the weight this Court must give to the factual allegations by Delaune and Finance Director Jean Philippe Calzolari. Even under the PSLRA, this Court must "accept all factual allegations in the complaint as true," as is typical at the motion to dismiss stage. *Tellabs II*, 551 U.S. at 322; *see also Tellabs II*, 551 U.S. at 323-24, 326; *Garden City I*, 2011 WL 1303387, at *18. Unlike the typical motion to dismiss though, this Court does not draw all reasonable inferences in Plaintiff's favor but instead weighs the competing inferences from those facts to determine if the inference of scienter from them is cogent and compelling. *Tellabs II*, 551 U.S. at 314, 324. This Court, therefore, takes the Amended Complaint's factual allegations as true but weighs the inferences drawn from those facts when analyzing the instant motion to dismiss.

Based on this governing standard, this Court accepts as true Delaune and Calzolari's allegations that Belcher and Busky initiated a false-invoicing scheme. Whether in fact true, an issue this Court does not reach at this stage, their allegations are unequivocal. Delaune describes Belcher as the fraud's architect. On July 19, 2012, Belcher, according to Delaune, proposed a false-invoicing scheme to prop-up Production Graphics' earnings. AC ¶ 132. Belcher, again according to Delaune, described how the scheme should be funded and carried out to remain undetected. AC ¶¶ 133-34, 137. Delaune stated that, "at a minimum," he spoke with Belcher every two weeks about the false-invoicing scheme. AC ¶ 138. As for Busky, Delaune alleged that Busky, among other things, advised him on the mechanics of keeping the false-invoicing scheme undetected. AC ¶¶ 139-40. Corroborating Delaune, Calzolari "firmly believe[d] that this scheme was requested by Eric Belcher and Joe Busky for the sole purpose of improving the results of the group and the stock exchange rating." AC ¶ 155; *see also* AC ¶¶ 154, 156-58. These are just some examples of the factual allegations this Court must accept as true at this initial stage.

Defendants, raising the issue of scienter, respond that Delaune and Calzolari were "admitted fraudsters" with an "axe to grind" against InnerWorkings. Defendants thus seek to discount their allegations. Challenging witness credibility is another way of arguing that their testimony is false. Defendants' defenses, accordingly, go to the truth of Delaune and Calzolari's allegations, but, as explained

above, this Court's role at the motion to dismiss stage is not to make those kinds of factual determinations. *Tellabs II*, 551 U.S. at 322-24, 326.

Instructive is the Court's decision in *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11-2700, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012). In that case, the Court denied a motion to dismiss Section 10(b) and Rule 10b-5 claims because, as here, credibility determinations were improper at that stage. *Id.* at *13. The plaintiffs relied on two analyst reports that claimed that SkyPeople Fruit Juice, the corporate defendant, had overstated its revenues in SEC filings. *Id.* SkyPeople Fruit Juice responded that the reports were "unreliable" because their authors intended to "short" the company's stock, that is, the authors stood to profit from SkyPeople Fruit Juice's stock price falling. *Id.* The Court rejected that argument as premature, explaining that it "must accept plaintiffs' factual allegations as true" and that a "motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations." *Id.*

Also instructive is *In re Retek Inc. Securities*, No. 02-4209, 2005 WL 1430296 (D. Minn. March 7, 2005). There, once the plaintiffs had laid a foundation for the allegations by their confidential witnesses, the Court declined to consider the corporate defendant's claim that those witnesses were not credible. *Id.* at *4. The Court found that it had to assume the truth of the pled allegations and thus could not make credibility determination at the motion to dismiss stage. *Id.* The guidance from *Lewy* and *In re Retek* holds true here.

Nothing in the cases cited by Defendants changes this Court's conclusion. While the Courts granted motions to dismiss in both *In re Satyam Computer Services Ltd. Securities Litigation*, 915 F. Supp. 2d 450, 480-81 (S.D.N.Y. 2013), and *SEC v. Cohmad Securities Corp.*, No. 09-5680, 2010 WL 363844, at *2-3 (S.D.N.Y. Feb. 2, 2010), neither involved, unlike here, direct factual allegations that the defendants had been involved in the underlying fraud. Instead, the Courts in those cases had to infer the existence of scienter from circumstantial evidence. Those Courts, moreover, confirmed that factual allegations must be accepted as true on a motion to dismiss, even if those allegations are "doubtful in fact." *In re Satyam Computer Services*, 915 F. Supp. 2d at 469, 478; *Cohmad Securities*, 2010 WL 363844, at *2.

Defendants point to the Seventh Circuit's decision in *Higginbotham*, which discounted information obtained from confidential witnesses. By applying this principle to named witnesses, however, Defendants extend *Higginbotham* beyond its limits. Not only does this Court's obligation to accept factual allegations as true remain, but also *Higginbotham*, as explained above, was addressing a problem unique and inherent to confidential witnesses: their anonymity. *See Tellabs III*, 513 F.2d at 711-12. Anonymity can frustrate the judiciary's ability to determine if the confidential witnesses have or lack a foundation for their allegations—an evidentiary concern heightened by the risk that, all else equal, anonymity promotes misrepresentations by hiding the speaker. *See Boeing*, 711 F.3d at 759; *Tellabs III*, 513 F.3d at 711-12; *Higginbotham*, 495 F.3d at 756-57. Anonymity further conflicts

with the PSLRA's requirements that claims be stated with particularity. *Garden City I*, 2011 WL 1303387, at \*20. The Seventh Circuit expressed these concerns in *Higginbotham*, 495 F.3d at 756-57, where the confidential witnesses were described merely as three ex-employees of the corporate defendant and two consultants, and no further foundational evidence was pled. *See also Tellabs III*, 513 F.3d at 711-12 (analyzing *Higginbotham*). These concerns also exist, at times, here, such as when CW2 claimed there was "no way" the inside sales group met InnerWorkings' goals for 2012 but Plaintiff did not lay a foundation for that statement.

These foundational concerns, by comparison, are not present with respect to Delaune and Calzolari, so *Higginbotham* is inapplicable. The two men were high-ranking executives at Productions Graphics and participants in the fraud, and they detail their involvement with Belcher and Busky. *See generally* the Delaune Note [38-6]; Calzolari Statement [38-7]. Defendants challenge Delaune and Calzolari's credibility and not, as in *Higginbotham*, the basis for their knowledge. *Higginbotham* thus is inapplicable.

Having taken the Amended Complaint's well-pled factual allegations as true, there is no escaping the conclusion that Belcher and Busky, through their purported involvement in the false-invoicing scheme, are alleged to have made false and misleading statements and omissions about Productions Graphics to investors. Assuming *arguendo* that this Court had to make credibility determinations, and it does not need to do so, Plaintiff nonetheless has raised a cogent and compelling inference of scienter against Defendants. This Court reaches that conclusion based

on its review of: (1) the Delaune Note [38-6]; (2) the Calzolari Statement [38-7]; and, (3) setting aside Plaintiff's motion to strike, the criminal complaint drafted and submitted to French authorities by InnerWorkings [43-32]. These documents detail the particulars of the false-invoicing scheme. And the Note and Statement are sufficiently specific that, even though Delaune and Calzolari are admitted members of the fraud and without taking a position on the merits of the documents, Plaintiff has raised a cogent and compelling inference that Belcher and Busky were also involved.

Defendants attempt to impeach Delaune by arguing that, in his Note, he adopted the criminal complaint, which contradicts certain factual allegations in the Note. This argument is unavailing because Delaune did not adopt the criminal complaint wholesale. Instead, in his Note, Delaune expresses his general agreement with the "substance of the facts" stated in the criminal complaint and, in the next sentence, clarifies that he does not view the criminal complaint as fully accurate:

> Christophe Delaune has taken note of this complaint (but not the attached documents): he does not contest the substance of the facts stated therein.
>
> On the other hand, they are set out in a way which does not correspond to the truth, which Eric Belcher and Joe Busky, the chairman and financial director of InnerWorkings Inc. (1) are only too aware of.

Criminal Complaint [38-6] at 1. Thus, contradictions between the Delaune Note (as well as the Calzolari Statement) and the criminal complaint, which was drafted by InnerWorkings, are to be expected. Delaune, Calzolari and InnerWorkings agree that a fraud occurred but disagree on its scope.

Defendants also argue that Belcher and Busky had no motivation to risk their careers and going to jail by involving themselves in the false-invoicing scheme. Defendants further argue that InnerWorkings would have been better off had "Productions Graphics just missed its earnings targets" because InnerWorkings had to pay Productions Graphics more for meetings earnings targets than the revenue generated when Productions Graphics met those targets. Not only is a showing of motive not required to plead scienter, *see Tellabs II*, 551 U.S. at 325, but also Defendants here view the motivations at play too narrowly.

Productions Graphics was InnerWorkings' largest acquisition, and InnerWorkings, and therefore Belcher and Busky as well, had incentives to prop-up Productions Graphics' sales to maintain market confidence and InnerWorkings' stock prices. *See* AC ¶¶ 8, 35, 129-30. InnerWorkings needed to maintain market confidence to obtain funding for new acquisitions, which drove the Company's revenue growth. AC ¶ 129. Confirming that new acquisitions drove InnerWorkings' revenue growth, on August 17, 2012, one analyst reported that contributions from InnerWorkings' acquisitions over the past year—"primarily Productions Graphics in Europe"—contributed 10 percentage points to revenue growth in Q2 2012. AC ¶ 190. Revenue growth comprised 40 percent of Belcher and Busky's bonus criteria in 2012 and 2013. AC ¶¶ 239-40.

Defendants last argue, yet do so only in a general manner, that certain statements about Productions Graphics are protected by the PSLRA's safe harbor, 15 U.S.C. § 78u-5(c)(1). Summary Table [43-2], attached as Exhibit A to

Defendants' Memorandum of Law, No. 10 (corresponding to AC ¶ 187), No. 16 (AC ¶ 194), Nos. 21-22, 24 (AC ¶ 197), No. 40 (AC ¶ 219), No. 45 (AC ¶ 225). All of these statements were made during earnings calls between August 10, 2012 and August 8, 2013. This Court cannot conclude that these statements are protected by the safe harbor at this initial stage.

The safe harbor contains two independent prongs. A statement is not actionable if: (1) identified as a forward-looking statement, and accompanied by "meaningful cautionary statements" identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (2) Plaintiff fails to prove that the forward-looking statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1); *see Selbst v. McDonald's Corp.*, No. 04-2422, 2005 WL 2319936, at *16 (N.D. Ill. Sept. 21, 2005).

Neither prong is met here, for reasons this Court can dispense with quickly. Defendants cannot seek safe harbor refuge by representing a risk that already has materialized (here, the fraudulent false-invoicing scheme), as a risk that could develop in the future. *Brasher v. Broadwind Energy, Inc.*, No. 11-991, 2012 WL 1357699, at *18 n.7 (N.D. Ill. April 19, 2012). Moreover, with respect to the first prong, a disclaimer is "meaningful" and covered by the safe harbor only if it mentions those sources of variance that, at the time of the projection, were the "principal or important risks." *Tellabs I*, 437 F.3d at 599-600. This Court reviewed the disclaimers accompanying the earnings calls, *see* Exhibits J, N, P, X and Y to

Defendants' Memorandum of Law [43], and finds that none discloses the risk here: fraud. Not all risks, of course, have to be disclosed for the safe harbor defense to accrue to Defendants, but, at this stage, this Court has no reason to believe that fraud was not one of the important and principal risks that should have been disclosed. *See Asher v. Baxter International Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004). Additionally, Plaintiff has shown in the allegations that Defendants made forward-looking statements with actual knowledge that they were false or misleading. Thus the safe harbor provision is unavailable for this second reason.

For these reasons, Plaintiff may proceed with the challenged statements about Productions Graphics.

### 3.    Internationalization of PPM4

Plaintiff challenges a statement by Belcher involving InnerWorkings' use of technology, *see* AC ¶¶ 191, 206, but fails to allege adequately that the statement was false or misleading when made or that Belcher spoke with the requisite scienter. During a March 11, 2013 investor conference, Belcher said that InnerWorkings was going to roll out "our technology," that is, the proprietary sales technology called "PPM4," AC ¶¶ 2, 43, on a global basis and convert Europe during that quarter: "Today we are rolling out our technology on a global basis, all currencies, all languages on one platform. We have already converted Latin America last quarter, Europe this quarter." AC ¶ 206. Plaintiff alleges this statement was false or misleading because, according to Delaune, Production Graphics, InnerWorkings' French acquisition, was not converted to PPM4 through

48

at least October 2013, months after Belcher's "this quarter" timetable.  AC ¶¶ 162,

207, 232.

The challenged statement is a classic example of inactionable "fraud by

hindsight." *Higginbotham*, 495 F.3d at 759-60; *Garden City I*, 2011 WL 1303387, at

*20 (collecting cases).  There is no allegation that Belcher reasonably knew on

March 11, 2013, when he spoke, that not all of InnerWorkings' European affiliates

would be converted to PPM4 that same quarter.  The statement only "became"

incorrect, therefore, when viewed in hindsight.  For these reasons, not only is the

statement not false or misleading when made, but Plaintiff has also not adequately

pled that Belcher acted with the requisite scienter.

### 4.      Enterprise Client Retention Rate

Plaintiff next alleges that certain statements Defendants made about

InnerWorkings' enterprise client retention rate were misleading because the

Company failed to disclose that it had lost Google as a client.  Specifically, Plaintiff

challenges two comments made at InnerWorkings' February 22, 2013 Investor Day:

(1) COO John Eisel's statement that the Company had a "98% client retention rate"

with its enterprise customers; and (2) Belcher's statement that "[w]e've resigned

every major contract that's come up, really throughout our history."  AC ¶202.

Plaintiff also challenges Busky's statement, made at a May 7, 2013 investor

conference, that InnerWorkings had a "98% retention rate on our enterprise deals."

AC ¶216.

Plaintiff claims that Defendants "knew, but failed to disclose, that 2012 revenues had been adversely affected by the loss of major clients like Google." AC ¶¶ 203, 217; *see also* AC ¶ 143. Defendants respond, among other things, that Plaintiff failed to plead that: (1) Google was one of InnerWorkings' enterprise clients, as required to disprove the 98 percent client enterprise retention comments; and (2) Google provided a material amount of revenue to InnerWorkings' bottom-line.

This Court agrees with Defendants. None of the challenged statements or the omission of mentioning Google's loss are false or misleading or even material. The fatal flaw in Plaintiff' argument is that InnerWorkings did not lose Google as a client—another company did. This is confirmed by Plaintiff's own factual allegations. In Paragraph 143 of the Amended Complaint, which comprises the basis of Plaintiff's claim, *see* AC ¶¶ 203, 217 (both citing AC ¶ 143), Plaintiff quotes Delaune who said that Busky told him in early October 2012 that "the planned acquisition of the company Merchandise Media … would not meet its targets, because they lost their biggest client, Google." Accordingly, Merchandise Media, not InnerWorkings, lost Google as a client; Google was the "biggest client" for Merchandise Media, not InnerWorkings; and, at the time of the loss, Merchandise Media had not yet been acquired by InnerWorkings. Plaintiff glosses over these distinctions, perhaps assuming that Google was a "major client" for InnerWorkings just because it was Merchandise Media's "biggest client." *See* AC ¶¶ 203, 217. That is not enough to meet the PSLRA's heightened pleading requirements. Plaintiff has

made no showing that Google was an enterprise client, let alone one that generated a material amount of revenue, if any, for InnerWorkings.

### 5. InnerWorkings' Putative Class Period Financials

Plaintiff finally challenges InnerWorkings' financials during the putative class period, including revenue figures and gross margins for the fiscal years ending December 31, 2011 and 2012, and for Q4 2011, Q1 to Q4 2012 and Q1 to Q3 2013. AC ¶179. InnerWorkings restated its financial results for those periods on April 21, 2014, as a result of the false-invoicing scheme at Productions Graphics. AC ¶¶ 159-60; *see also* AC ¶ 179. Plaintiff pled, although neither party expressly analyzes this allegation in their motion papers, that the "aggregate net impact of the corrections across all affected periods is a net decrease in income before taxes of $2.2 million." AC ¶ 160; *see* AC ¶ 159 (2/18/14 press release anticipating the magnitude of the restatements). Plaintiff also pled that InnerWorkings acknowledged a "material weakness" in internal control over financial reporting for the affected periods. AC ¶ 161.

Defendants argue that Plaintiff has not shown that the alleged inaccuracies are material because Plaintiff has not pled "even a general figure" by which he contends that InnerWorkings' class-period financials were inaccurate. That is not quite right, as Plaintiff did plead that InnerWorkings restated its financial results by $2.2 million across all affected periods. AC ¶ 160; *see* AC ¶ 159. Yet Defendants nevertheless have a viable argument, because they are correct that Plaintiff failed to plead what the restated revenue and gross margin numbers were in each period,

and facts showing that those restatements are material in light of InnerWorkings'
overall financial figures.

Nonetheless, the factual allegations here are sufficient at this initial stage,
although perhaps just barely.  Courts in this District have found restatements
material even when the plaintiff did not plead the precise amount by which the
corporate defendant's financial statements were in error.  *E.g.*, *Chu*, 100 F. Supp. 2d
at 821-22 (Castillo, J.) (citing *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d
923, 935 n.6 (N.D. Ill. 1999) (Conlon, J.)); *see also Roth v. OfficeMax, Inc.*, No. 05-
236, 2006 WL 2661009, at *4 (N.D. Ill. Sept. 13, 2006) (Gottschall, J.); *Davis I*, 385
F. Supp. 2d at 708-09 (Moran, J.).  The Court in *Chu* found that restated financial
results were material under circumstances less compelling than here.  The plaintiff
gave examples of transactions where Sabratek, the corporate defendant, did not
recognize revenue in compliance with GAAP, but failed to give "the dollar amounts
by which Sabratek's financial statements have been misstated as a result of these
transactions."  100 F. Supp. 2d at 821-22.  In *Roth*, 2006 WL 2661009, at *1, 3-4,
OfficeMax, the corporate defendant, restated its financial statements for Q1 to Q3
2004, and the Court found these restatements were material based on, as here, the
plaintiff, unlike the one in *Chu*, pleading the amount by which revenues were
overstated ($7.1 million for Q1, and $1 million for each of Q2 and Q3) and
acknowledging internal control problems.  The Court explained that the
misstatements are material because they reflect "consequential facts about the

Company, namely, its financial health." *Id.* at *4. These cases guide this Court's decision here.

While there may be some tension between these cases and the ones from outside this District that Defendants argue require more at the pleading stage, *e.g.*, *In re Hansen Natural Corp. Securities Litigation*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007), and *Gavish v. Revlon, Inc.*, No. 00-7291, 2004 WL 2210269, at *15-16 (S.D.N.Y. Sept. 30, 2004), this Court is disinclined to depart from the consensus rule in this District. *In re Hansen Natural* and *Gavis* also are not inconsistent with this Court's decision today, because Plaintiff has quantified the magnitude of the restatement here—an important factual allegation that the Courts in *In re Hansen Natural* and *Gavis* emphasized was missing there.

For these reasons, Plaintiff may proceed with his claims about InnerWorkings' putative class period financials.

**B.      Count III: Section 20(a)**

In Count III, Plaintiff alleges that Defendants are liable under Section 20(a) of the Securities Exchange Act of 1934. Defendants seek to dismiss this "control-person" claim on the ground that Plaintiff has failed to allege a primary securities fraud violation. Section 20(a) provides in relevant part that: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter … shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a Section 20(a) claim, Plaintiff must allege: (1) a primary

securities violation; (2) that each of the Defendants exercised general control over the operations of InnerWorkings; and (3) that each of the Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *accord Hospira*, 2013 WL 566805, at *28.

Because Plaintiff has pled a primary securities violation as to the statements about Productions Graphics and InnerWorkings' putative class period financials only, and Defendants have not challenged Plaintiff's Section 20(a) claims on any other grounds, the Section 20(a) claim stands as to those claims only. Conversely, with respect to the other allegedly false or misleading statements or omissions for which Plaintiff has failed to plead a primary securities law violation, Plaintiff's Section 20(a) claim fails. *See Pugh*, 521 F.3d at 693; *Hospira*, 2013 WL 566805, at *28.

## IV. Conclusion

Defendants' motion to dismiss [41] is granted in part and denied in part. Consistent with this Court's Memorandum Opinion and Order, Plaintiff may proceed with Counts I to III with respect to the statements about Productions Graphics and InnerWorkings' putative class period financials. Conversely, as set forth in this Opinion, Plaintiff may not proceed with Counts I to III with respect to the statements about the inside sales group, the internationalization of PPM4 and the enterprise client retention rate. These portions of Counts I to III are hereby

dismissed with prejudice and without leave to amend. In declining to give leave to amend, this Court notes that had Plaintiff believed that a *Second* Amended Complaint was warranted after reviewing Defendants' moving papers, then, for the reasons discussed in *Fannon v. Guidant Corp.*, 583 F.3d 995, 1001-02 (7th Cir. 2009), and *Pugh*, 521 F.3d at 698, Plaintiff should have sought leave to amend then in lieu of opposing the motion and thereby compelling the expenditure of time and resources by Defendants to reply and this Court to render a decision.

This case is set for a status hearing on October 7, 2015 at 9:45 a.m. in Courtroom 1725. At the status, the parties shall come prepared to: (1) set a deadline for the Defendants to file their Answer to the remaining portions of the Amended Complaint; (2) discuss a proposed discovery plan; and (3) report on the status of any settlement discussions. On or before the status hearing, the parties shall file a joint status report not to exceed five pages addressing Sections 2(b) and 4 of this Court's "Initial Status Report Template," which can be found in this Court's Standing Order for "Initial Status Conferences."

Dated: September 30, 2015

Entered:

John Robert Blakey
United States District Judge